# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Adelina Gomez, on behalf of herself and all others similarly situated, | Case No. _____ |
| *Plaintiff,* | **CLASS ACTION COMPLAINT** |
| v. | |
| Credit Suisse AG, | |
| *Defendant.* | |

## CLASS ACTION COMPLAINT

Plaintiff Adelina Gomez (hereafter, "Plaintiff"), through her undersigned counsel, and based on counsel's investigation, documents filed with the Securities and Exchange Commission ("SEC"), press releases, and other information obtained by Plaintiff, brings this Class Action Complaint on behalf of herself and all others similarly situated against Credit Suisse AG ("Credit Suisse").

## NATURE OF ACTION

1.      This action arises out of Credit Suisse's announcement of its decision to delist and suspend the issuance of its exchange traded note ("ETN") product, DGAZ.

2.      ETNs are daily trading products—notes—intended to track the price of an underlying index, *i.e.*, a numerical average of specific commodities or securities prices. ETNs track the index price through two interdependent mechanisms: the ability to purchase and redeem notes directly through the issuer at a price based on the note's indicative value (calculated based on the daily settlement prices of the futures contracts included in the applicable index), and a liquid

1

secondary market that allows arbitrageurs to exploit differentials in market pricing versus issuer pricing. Together these mechanisms combine such that the price of the ETN will track the applicable index as reflected in the ETN's indicative value.

3.      Beginning in February 2012, Credit Suisse issued DGAZ and listed it on the NYSE Arca Exchange. DGAZ's objective was to provide daily leveraged inverse exposure to the S&P's GSCI Natural Gas [ER] Index ("Index"). In general, if the Index went down, DGAZ's "Indicative Value"—calculated as a product of the prior day's closing value multiplied by the 3x leveraged daily Index performance, minus Credit Suisse's investor fees—would increase in value. If the Index went up, DGAZ would decrease in value accordingly.

4.      Investors who believed the Index would increase over time could short[1] DGAZ in an attempt to make a profit. As the Index increased, the price of DGAZ would decrease accordingly, allowing those who shorted it at a higher price to make a profit on the difference between the price at which they borrowed DGAZ and the price they later paid to cover their short.

5.      Throughout its existence and at all points relevant hereto, DGAZ had a substantial short interest.

6.      All short investments relied on the integrity of the DGAZ market to ensure that its value increased or decreased commensurate with the behavior of the Index.

7.      From its inception until it was delisted, DGAZ functioned as it was intended, increasing and decreasing in line with the behavior of the Index, with minimal divergence. From February 2012 until June 18, 2020, DGAZ's average price was almost identical to the Indicative

---

[1] As used herein, the term "short" is used to describe a conventional short sale scenario whereby an investor borrows a security and sells it on the open market at the then-prevailing market price. The borrower is then obligated to return the security to the original seller at a later date. The borrower will "cover" the short by repurchasing the same security at the current market price and returning it to the original seller. If the borrower is able to repurchase the security at a lower price than she sold it for, she will make a profit on the transaction.

Value, trading at an average -0.11% discount. Minimum and maximum variability during this time period were -9.39% and +12.80%, respectively.

8.     All told, the correlation of DGAZ's daily price and its daily Indicative Value was 99% over the life of the product prior to the delisting.

9.     On June 22, 2020, Credit Suisse announced through a press release (the "Press Release") that DGAZ, and certain other ETNs, would be delisted from NYSE Arca on July 10, 2020.

10.     That same Press Release also announced that Credit Suisse would suspend further issuances of DGAZ, effective immediately. Any outstanding DGAZ units would be shifted to an OTC market and traded under a new ticker symbol, DGAZF.

11.     Credit Suisse's actions destroyed DGAZ, preventing it from achieving its sole objective of tracking the Index.

12.     Historically, in those rare instances when an ETN is delisted and further issuances suspended, the price will trade at a discount to the underlying indicative value, as investors' only other option is to carry outstanding notes until maturity while their value decays toward zero.

13.     Consistent therewith, the Press Release explicitly warned investors that they may not be able to sell their ETNs in the secondary market following the delisting.

14.     The Press Release made no mention of the risk that the price of the ETNs would become dislocated entirely from the Indicative Value—that the ETN would no longer function on the terms on which it had been sold—following the Press Release.

15.     This risk was particularly acute as to DGAZ, for two primary reasons.

16.     First, DGAZ had a substantial short interest as of the date of the Press Release, one that was significantly higher than any of Credit Suisse's other ETN products. In normal

circumstances, investors looking to cover their short positions could look to Credit Suisse to issue additional notes; however, since Credit Suisse stopped issuing DGAZ immediately after the Press Release, these investors would have to look elsewhere.

17.     Second, Credit Suisse had effective exclusive control over the supply of DGAZ shares immediately prior to the effective date of the delisting. As of June 30, 2020, data reported to the SEC shows that Credit Suisse held 431,350 units of DGAZ, compared to only 305,418 outstanding.[2]

18.     Credit Suisse's DGAZ holdings were 70x higher than its interest in DGAZ's companion product UGAZ, and many multiples higher than Credit Suisse's holdings in any of the other ETNs announced for delisting in the Press Release:

| TICKER | CUSIP | Credit Suisse Holdings 6/30/2020 | Shares Outstanding 6/22/2020 | Credit Suisse Fractional Holdings |
|--------|-------|----------------------------------|------------------------------|-----------------------------------|
| UGAZ | 22539T183 | 804,474 | 47,729,310 | 2% |
| DGAZ | 22542D282 | 431,350 | 305,418 | 141% |
| UGLD | 22542D316 | 75,500 | 1,475,530 | 5% |
| DGLD | 22542D670 | 193,000 | 854,010 | 23% |
| USLV | 22542D290 | 180,000 | 6,128,220 | 3% |
| DSLV | 22542D654 | 1,000,000 | 2,495,940 | 40% |
| ZIV | 22542D829 | 100,026 | 2,348,000 | 4% |
| VIIX | 22542D266 | 192,114 | 705,820 | 27% |

---

[2] To sell short a security, a short seller must borrow that security from an owner (referred to as the Beneficial Owner). Each unit sold short creates a book-keeping entry of an additional unit. The original unit, acquired by the investor who purchased from the short seller, is the only one that truly exists. From the issuer's standpoint, this party is the 'unit owner on record.' Due to the security loan from the Beneficial Owner, the short seller is obligated to return that share at a later date, and the lender is entitled to the economic benefits of the security although it is no longer in their possession. From a bookkeeping perspective, they are still 'long' the unit. Accordingly, products with a large short interest can have total reported long positions greater than the number of shares outstanding.

| TVIX | 22542D258 | 1,827,495 | 9,138,280 | 20% |

19.     In other words, Credit Suisse, after accounting for shares lent to short sellers, held more than 100 percent of the long interest in DGAZ.

20.     This made DGAZ unique among the nine ETNs announced for delisting in the Press Release, and indeed, among all leveraged ETNs Credit Suisse had delisted since it started selling ETNs in 2007.

21.     In light of the foregoing, Credit Suisse's decision to delist and stop further issuance of DGAZ units was made with reckless disregard for the very likely, almost certain, risk that a short squeeze and corresponding dislocation between the price of DGAZ and the Index would follow. There were simply not enough long positions available from other places to cover outstanding short obligations.

22.     In fact, Credit Suisse was uniquely positioned to avoid a short squeeze altogether, and could have done so at all points relevant hereto.

23.     None of this was disclosed in the Press Release.

24.      This scenario—a dislocation and a short squeeze—is exactly what occurred after the delisting when DGAZ began trading on an over-the-counter exchange, OTC Pink, under the ticker name DGAZF.

25.     Beginning in early August, the lack of primary market liquidity and the inability to purchase new shares from Credit Suisse caused the ask pricing on DGAZF to become completely dislocated from its Indicative Value. Long positions raised their ask prices higher with each passing hour, regardless of the performance of the underlying Index or the product's Indicative Value. This trend worsened exponentially over the next two weeks (defined *infra* as the "Manipulation Period"):



26.     As of August 4, 2020, DGAZF was trading at $600 or higher. Meanwhile, its Indicative Value was approximately $120.

27.     This differential increased steadily for the next eight days, reaching peak absurdity on August 12, when DGAZF prices peaked at approximately $25,000 *per note*. By then holders of short positions were facing nearly limitless exposure—an individual who was short only 10 shares of DGAZ (which under normal circumstances would have been less than a $1,500 obligation) was looking at $250,000 or more to cover those ten positions.

28.     This entire time DGAZF's Indicative Value hovered in the $110-$130 range.

29.     At the end of the day on August 12th, FINRA halted trading on DGAZF.

30.     On August 12, 2020—the same day that trading was halted— after the market closed, Credit Suisse changed course and announced it was exercising its option to accelerate all outstanding DGAZF ETNs, with investors to receive a cash payment to the average of the closing

indicative values of the DGAZF ETNs during the accelerated valuation period between August 14, 2020 to August 20, 2020.

31.     By then it was too late for hundreds, if not thousands, of retail investors who had been caught in the short squeeze. Some of the investors caught in the squeeze were able close out their positions at the artificially inflated prices, while others were not so lucky and were hit with margin calls or forced liquidations at whatever the prevailing price happened to be at the time.

32.     Credit Suisse, as DGAZ's issuer and market maker, was aware of these risks when it issued the Press Release. Specifically, Credit Suisse knew the number of long, and in particular the extensive short positions outstanding as of the time of delisting. Credit Suisse also knew that these short positions relied on the ability to repurchase notes at a price that was reasonably correlated to the Index.

33.     While Credit Suisse's offering documents provided general warnings about its ETN products trading at potential premiums and/or discounts above or below the indicative value based on market liquidity, what followed after the delisting was not a mere premium. DGAZF took on a life of its own, wholly independent of its Indicative Value, as holders of long positions squeezed the life out of DGAZ short sellers who had maintained their positions in reliance on the belief that DGAZF following the Press Release would continue to function as a viable ETN traded in an efficient market free from manipulation.

34.     The hallmark of an ETN is the fact that it correlates to its indicative value. Credit Suisse knew that its dual actions of delisting DGAZ and stopping the issuance of further notes would "break" the product by destroying the mechanisms used to ensure that the price of the product tracked the Indicative Value, which in light of the outstanding short interest made a squeeze virtually certain to occur.

35.     Credit Suisse ignored these risks and failed to disclose this information to the market when it announced in the Press Release its decision to delist and stop further issuances.

36.     Credit Suisse's decision to delist, as opposed to accelerate, positioned the company to sell notes to those caught in the squeeze. In the meantime, Credit Suisse would receive its daily investor fees—1.65 percent annualized—on each and every outstanding DGAZ note. This represented approximately $1.5 million annually based on the shares outstanding and Indicative Value as of the Press Release. Credit Suisse essentially paid itself to wait for the short squeeze to materialize.

37.     This class action is brought against Credit Suisse on behalf of all holders of DGAZ short positions who were caught in the "short squeeze" and purchased DGAZ notes via the OTC market, either voluntarily or involuntarily through a broker liquidation, to cover their short position in August 2020.

## PARTIES

38.     Plaintiff Adelina Gomez is, and was at all times mentioned herein, an individual citizen of the State of New York, and currently resides in that state. Plaintiff sold and purchased DGAZ notes and suffered significant monetary loss during the Class Period defined *infra*.

39.     Defendant Credit Suisse AG is a Swiss company that operates globally, including operations within the United States for the past forty years, and is regulated by the Securities and Exchange Commission. Credit Suisse maintains its principal place of business within the United States at 11 Madison Avenue, New York, NY 10010. Credit Suisse offers numerous financial products and services, and served as the issuer of the DGAZ notes described in this Complaint.

## JURISDICTION AND VENUE

40.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), codified at 28 U.S.C. § 1332(d)(2). The matter in controversy exceeds $5,000,000, in the aggregate, exclusive of interest and costs, and there is diversity of citizenship between Plaintiff and Credit Suisse.

41.     This Court may exercise personal jurisdiction over Credit Suisse under 15 U.S.C. § 78aa.

42.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because "a substantial part of the events or omissions giving rise to the claim occurred" within New York. 28 U.S. Code § 1391(b)(2).

## FACTUAL ALLEGATIONS

A.   Background – Exchange Traded Notes, Credit Suisse, and DGAZ

43.     An Exchange Traded Note, or an ETN, is an unsecured debt instrument that functions similar to promissory notes, insofar as investors pay money to the institution sponsoring the ETN, and upon maturity, receive money. Unlike traditional promissory notes, ETNs do not pay interest. Rather, the value of ETNs is derived from the return on a particular market index, and payment is subject to the creditworthiness of the sponsor issuing the ETN.

44.     ETNs are traded on major exchanges. In many cases—including DGAZ—the issuer serves as market maker, buying or selling ETNs at prices that track the daily performance of the underlying market index.

45.     Leveraged ETNs are rebalanced daily, are subject to daily fees, and therefore not "buy and hold" investments. They are daily trading tools and thus correlation to the underlying market index on a daily basis is the hallmark of the ETN product. In general, the ETN's "indicative

value," calculated as a product of the applicable leverage multiple and the daily index return, minus the issuer's fees—will increase (or decrease, as applicable) commensurate with the daily performance of the Index.

46.     Inverse ETNs, as their name implies, are designed to deliver a return to investors that approximates the inverse of the performance on an underlying referenced index. Thus, investors who believe that the price of the underlying market index will decrease over time may be inclined to invest in an inverse product.

47.     Conversely, those who believe the market index may increase may be inclined to short an inverse ETN product, *i.e.*, borrow ETNs to sell now, on the assumption that the market will increase – thus causing the price of the ETN to drop – in the future.

48.     On February 7, 2012, Credit Suisse issued two 3x levered ETN products that tracked the daily performance of the S&P GSCI Natural Gas Index ER (the "Index"). The S&P GSCI is an index that tracks a production-weighted basket of principal non-financial commodities (*i.e.*, physical commodities) that satisfy specified criteria and represents the return of a portfolio of commodity futures contracts included in the S&P GSCI. The S&P GSCI is designed to be a measure of the performance over time of the markets for these commodities.

49.     One of those products was a leveraged 3x long of the Index, and the other was a leveraged 3x inverse of the Index. These ETNs were traded on NYSE Arca under the tickers "UGAZ" and "DGAZ," respectively.

50.     DGAZ was offered pursuant to a registration statement, prospectus, prospectus supplement, and a series of pricing supplements, each of which was filed with the SEC pursuant to Rule 424(b)(2).[3]

---

[3] The applicable DGAZ prospectuses and their supplements, including the pricing supplements, are referred to collectively herein as the "Prospectus."

51.    Credit Suisse's affiliate, Credit Suisse Securities (USA) LLC ("CS USA") served as Credit Suisse's agent for the DGAZ offering. All DGAZ notes, including those sold short as described in this complaint, were originally offered and sold by CS USA from its headquarters in New York, New York

52.    The following language in the DGAZ Prospectus made clear that DGAZ would track the daily performance of the Index:

- The ETNs track the daily performance of the S&P GSCI® Natural Gas Index ER (as applicable to the relevant ETN, the "Index,"), as reflected by their Indicative Value, calculated as set forth below.

- Is this the right investment for you? The ETNs may be a suitable investment for you if [y]ou seek exposure to fluctuations in volatility in general and on a leveraged long or leveraged inverse basis, as applicable, to the performance of the Index.

- Is this the right investment for you? The ETNs may be a suitable investment for you if: ….You are willing to accept the risk of fluctuations in the price of natural gas futures in general and in the level of the Index in particular.

- Is this the right investment for you? The ETNs may be a suitable investment for you if: ….You do not seek a direct investment that tracks the spot price of natural gas or to buy or hold natural gas directly, but rather seek exposure to the commodities futures contracts composing the Index tracked by the ETNs.

- The ETNs are not a suitable investment for you if: You do not seek exposure on a 3x leveraged basis to fluctuations in the price of natural gas futures contracts in general and in the performance of the Index in particular…

- The ETNs are not a suitable investment for you if: … You believe the level of the Index will decrease (if you invest in the Leveraged Long ETNs) or increase (if you invest in the Leveraged Inverse ETNs).

- The ETNs reflect a leveraged long or leveraged inverse position, as applicable, in the Index, which tracks a futures contract on a single commodity, and thus are much less diversified than funds, investment portfolios or Index investing in or tracking a broader range of products. The price of natural futures contracts may not correlate to the price of commodities generally and may diverge significantly from the prices of commodities generally. Because the ETNs are linked to an Index reflecting a concentrated investment, they carry greater risk and may be more volatile than a security linked to the prices of multiple assets or a broad-based index.

53.     Parties wishing to buy or sell DGAZ issue bid and ask quotes that are routed through the Arca secondary market.

54.     A liquid secondary market, combined with Credit Suisse's ability to sell and/or redeem shares, was vital to DGAZ's tracking of the underlying Index.

55.     Credit Suisse's affiliate CS USA acted as market maker for DGAZ. In this capacity Credit Suisse sold, and/or purchased via redemption, DGAZ notes as necessary at prices to achieve the stated purpose of tracking the Index Value. Credit Suisse's market making is backstopped by professional traders acting as arbitrageurs to profit from any pricing differentials that may exist between Credit Suisse's pricing and the secondary market price.

56.     Together, these two forces combine to ensure that the ETN—in this case, DGAZ—tracks closely the pricing of the underlying Index.

57.     DGAZ notes were set to mature in 2032. However, in practice no reasonable investor would hold the notes until maturity because, due to a combination of daily resetting leverage and Credit Suisse's daily investor fee, the price of the note would decay toward zero over time. Consistent therewith, the Prospectus warned investors that DGAZ notes were not "buy and hold" investments and instead were intended to be traded on a daily basis. The functional secondary market, along with Credit Suisse's actions market making activities, allowed that daily trading to occur.

58.     Further to the above, DGAZ investors had three options for cashing out their investments: they could find a willing buyer on the secondary market; they could present large blocks of notes (generally > 25,000) to Credit Suisse for redemption; or, Credit Suisse could "accelerate" the notes whereby it purchases all outstanding notes at the average Indicative value

for a specified continuous five day period. Together these mechanisms created and promoted an efficient market where DGAZ's pricing tracked its Indicative Value.

59.     From its inception until mid-June 2020, DGAZ functioned as it was intended, increasing or decreasing in line with the behavior of the Index, with minimal divergence. From February 2012 until June 18, 2020, DGAZ's average price was almost identical to the Indicative Value, trading at an average -0.11% discount. Minimum and maximum variability during this time period were -9.39% and +12.80%, respectively. All told, the correlation of DGAZ's daily price and its daily Indicative Value was 99% over the life of the product prior to the delisting.

B.  The Press Release

60.     On June 22, 2020, Credit Suisse announced its intention to delist and suspend further issuance of DGAZ, along with eight other ETNs, including UGAZ.

61.     Credit Suisse did not provide a reason for the decision, other than a generalized statement that it was trying to better align its product suite with its strategic growth plans.

62.     As noted above, Credit Suisse had the option to accelerate the DGAZ notes as opposed to delisting them. Credit Suisse had previously opted to end particular ETN products by accelerating them. For example, in 2018 Credit Suisse accelerated 5 ETNs, including two offerings that, like DGAZ, were listed on NYSE Arca.[4] Credit Suisse is currently facing lawsuits alleging that it concealed problems with one of those ETNs—VelocityShares Daily Inverse VIX Short Term ETN—prior to the acceleration.

63.     In response to one of those suits, Credit Suisse's then-CEO, Tidjame Thiam, defended Credit Suisse by claiming that the company had "been hyper clear … what the risks are.

---

[4] https://www.credit-suisse.com/about-us-news/en/articles/media-releases/cs-announces-the-acceleration-of-five-etns-201807.html

Really it's a matter for regulators whether they need to stop retail investors from investing in [ETNs]."[5]

64.     Despite Thiam's boasts, the Press Release announcing that DGAZ was being delisted was not at all transparent about the particularized risks that would ensue in light of the product's substantial short interest.

65.     By choosing to delist, Credit Suisse effectively destroyed DGAZ's liquidity and took away investors' ability to trade in a rational market. When this occurs the reasonable expectation is that ETN prices will trade at a discount to the product's indicative value, as retail investors are left with two options – hold the notes to maturity (not a viable option due to decay), or, sell them at a discount to an institutional investor looking to roll up large blocks to present for redemption.

66.     This is exactly what occurred when CS delisted a prior fund, UWTI, in 2016.[6] The UWTI ETNs traded at a discount to the Index value of approximately ten percent.

67.     Consistent therewith, the Press Release announcing the delisting went into great detail describing how DGAZ could trade at a discount after the delisting:

> As disclosed in the Risk Factors section of the Pricing Supplement, the market value of the ETNs may be influenced by, among other things, the levels of actual and expected supply and demand for the ETNs in the secondary market. It is possible that this announcement and the delisting and suspension of further issuances of the ETNs, as described above, may influence the market value of the ETNs. For example, delisting the ETNs will remove the primary source of liquidity for the ETNs and investors may not be able to sell their ETNs in the secondary market at all. In addition, suspending further issuances of the ETNs may further adversely affect liquidity for any secondary market that may develop following a delisting. Credit Suisse AG cannot predict with certainty what impact, if any, these events will have on the public trading price of the ETNs. Investors are cautioned that paying a premium purchase price over the indicative value of the ETNs could

---

[5] https://www.cnbc.com/2018/03/19/credit-suisse-vix-etn-lawsuits-tidjane-thiam-says-bank-not-at-fault.html

[6] https://www.reuters.com/article/us-usa-investment-etn/investors-in-delisted-oil-etns-sell-but-at-a-price-idUSKBN13Y2LT.

lead to significant losses. An investor that pays a premium for the ETNs, for example, may suffer significant losses if the investor is unable to sell the ETNs in the secondary market, if the investor sells at a time when the premium has declined or is no longer present or if Credit Suisse AG accelerates the ETNs at its option. Even if investors do not pay a premium over the indicative value of the ETNs, investors could still suffer substantial losses because of the illiquidity associated in the secondary market. For instance, investors may not be able to sell the ETNs readily and may suffer substantial losses and/or sell the ETNs at prices substantially less than their intraday indicative value or closing indicative value, including being unable to sell them at all or only sell them for a price of zero in the secondary market.

68.    The Press Release made no reference whatsoever to the risk of a premium, nor was there any disclosure of the risk that the price of the ETN could wholly separate from its indicative value—not just trade at a discount (or a premium) to that value. This was material because at the time of delisting outstanding short interests for DGAZ were more than $135 million, a substantial portion of which was held by retail investors.

69.    DGAZ's short interest was extremely high in comparison to the number of notes in existence (share outstanding), and further, was extremely high compared to other Credit Suisse ETN products.

70.    In normal circumstances, investors looking to cover their short positions could look to Credit Suisse to issue additional notes; however, since Credit Suisse stopped issuing DGAZ immediately after the Press Release, these investors would have to look elsewhere.

71.    Credit Suisse had effective exclusive control over the supply of DGAZ shares at the time of the Press Release. As of June 30, 2020, data reported to the SEC shows that Credit Suisse held 431,350 units of DGAZ, compared to only 305,418 outstanding.

72.    At the time of the Press Release Credit Suisse's DGAZ holdings were 70x higher than its interest in DGAZ's companion product UGAZ, and many multiples higher than Credit Suisse's holdings in any of the other ETNs announced for delisting in the Press Release:

| TICKER | CUSIP | Credit Suisse Holdings 6/30/2020 | Shares Outstanding 6/22/2020 | Credit Suisse Fractional Holdings |
|---|---|---|---|---|
| UGAZ | 22539T183 | 804,474 | 47,729,310 | 2% |
| DGAZ | 22542D282 | 431,350 | 305,418 | 141% |
| UGLD | 22542D316 | 75,500 | 1,475,530 | 5% |
| DGLD | 22542D670 | 193,000 | 854,010 | 23% |
| USLV | 22542D290 | 180,000 | 6,128,220 | 3% |
| DSLV | 22542D654 | 1,000,000 | 2,495,940 | 40% |
| ZIV | 22542D829 | 100,026 | 2,348,000 | 4% |
| VIIX | 22542D266 | 192,114 | 705,820 | 27% |
| TVIX | 22542D258 | 1,827,495 | 9,138,280 | 20% |

73.    In other words, Credit Suisse, after accounting for shares lent to short sellers, held more than 100 percent of the long interest in DGAZ.

74.    This made DGAZ unique among the nine ETNs announced for delisting in the Press Release, and indeed, among all leveraged ETNs Credit Suisse had delisted since it started selling ETNs in 2007.

75.    DGAZ's lack of market liquidity following the Press Release was of critical importance in light of DGAZ's substantial short interest. Adequate liquidity was necessary for the orderly unwinding of that short interest, as an investor looking to close out a short position must purchase the security they sold short and deliver that security to close out the security loan.

76.    Consistent therewith, DGAZ's trading volume was robust on Arca prior to the delisting, averaging approximately 1 million trades per day. Trading volume would decrease to a

fractional percentage of that number once the delisting became effective and DGAZ moved to an over-the-counter market that lacked the same infrastructure.

77.     All of this combined to make a short squeeze—*i.e.*, a scenario where institutions holding long positions could manipulate trade prices to force individuals looking to cover their short positions—readily and immediately foreseeable as a consequence of the delisting.

78.     In its capacity as issuer and market maker, Credit Suisse had firsthand actual knowledge of the outstanding short interest for DGAZ, and necessarily knew that market conditions were such that the risk of a short squeeze was imminent if and when market liquidity and efficiency were destroyed.

79.     That Credit Suisse both knew of DGAZ's substantial outstanding short interest, and also reported holdings of DGAZ that exceeded the number of units that Credit Suisse reported to be in existence, necessarily means that Credit Suisse knew a short squeeze—and corresponding dislocation between the price of DGAZ and the Index—was very likely to occur following the delisting and cessation of further issuance of units as announced in the Press Release. There were simply not enough long positions available from other places to cover outstanding short obligations. This also means that Credit Suisse was uniquely positioned to avoid a short squeeze altogether. None of this was disclosed in the Press Release.

80.     Against this backdrop Credit Suisse's decision to delist DGAZ, instead of redeeming it, was made in conscious disregard for the interests of DGAZ investors, including those who held short positions and relied on the product trading at levels that bore some relationship to the Indicative and/or underlying Index values.

81.     Credit Suisse's recklessness is underscored by the fact the Press Release failed to make any reference whatsoever to the known risk of a short squeeze that would cause delisted shares of DGAZ to trade at a price that was wholly dislocated from the Indicative Value.

82.     Credit Suisse receives 1.65 percent of the total value of DGAZ as long as its notes remain outstanding—thus, by leaving DGAZ to "die on the vine" instead of accelerating it, Credit Suisse stood to realize an additional $1.5 million in fees.

83.     Moreover, if those notes are held to maturity their value will approach or reach zero—meaning Credit Suisse would have collected fees on them for more than a decade without any ultimate payment obligation.

84.     Comparing the short interest reported to the quarterly ownership disclosures, Credit Suisse held positions greater than 100% of the outstanding long positions in DGAZ as of the end of both the first quarter and second quarter of 2020.

85.     Credit Suisse was therefore uniquely positioned to benefit from the impending short squeeze. Indeed, Credit Suisse created a zero-risk scenario for itself whereby it would receive daily fees; sell its own DGAZ notes at the inflated rates as the manipulated market would bear; and, ultimately retire any remaining outstanding notes at maturity for next-to-nothing.

C.   The Short Squeeze

86.     Effective June 22, 2020, Credit Suisse suspended further issuance of DGAZ notes.

87.     DGAZ traded on the NYSE up to and including July 10, 2020, after which it was picked by an over-the-counter exchange, "OTC Pink," and began trading under the ticker name DGAZF.

88.     The inability to purchase shares plus the lack of a secondary market destroyed DGAZ's market liquidity. Due to the lack of liquidity the product no longer functioned as an ETN tied to the price of the indicative value as represented in the prospectus.

89.     Conditions reached a point of no return in early August 2020.

90.     DGAZF's indicative value fluctuated between $110 and $130 during the first two trading weeks of August 2020.

91.     The price of DGAZF—which was supposedly tied to the product's indicative value—increased exponentially during this same period (hereafter, the "Manipulation Period").

92.     On August 3, 2020 DGAZF was trading around $600. By August 10 it was trading around $3,500.

93.     The following chart depicts the extreme the dislocation during the Manipulation Period:



94.     Investors who held the $130 million worth of DGAZ shorts found themselves at the mercy of a market with extremely limited liquidity—Credit Suisse had shut down the creation mechanism used to create new notes, as well as the primary market through which those notes were traded.

95.      By August 12, 2020, DGAZF was trading an obscene $25,000 per share, or more than 200x its Indicative Value. This pricing disconnect was historic. Never had a publicly-traded ETN reached even a 100 percent premium, let alone the 200x premium as occurred during the Manipulation Period.

96.     Numerous investors had their DGAZ short positions (and sometimes other securities) liquidated by their brokerage firms to limit further potential losses.

97.     An investor who had sold short one hundred DGAZ notes, which would have represented a $10,000-to-$15,000 exposure if transacted during the time Credit Suisse was still treating the product as an ETN, instead found herself facing a $2,500,000 liability, an amount that would gut nearly any investor's life savings.

98.     Finally, on August 12, 2020, FINRA halted trading in DGAZF.

99.     On that same date, Credit Suisse announced it would be accelerating DGAZ notes and giving holders fair value during a redemption process pursuant to which investors would receive a cash payment on a per-ETN basis equal to the arithmetic average of the closing indicative values of the ETNs during the period August 14, 2020 to August 20, 2020.

100.    Although this stabilized the market going forward for any remaining short interests, it was too little, too late for those investors who had been forced to cover their DGAZ shorts during the Manipulation Period. Adding insult to injury, these investors were actually correct in their belief as to the performance of the Index that DGAZ was supposed to track. If the product had

been managed as intended, these investors would have been looking at profits, not life-changing losses.

101.    These losses could have been avoided had Credit Suisse provided meaningful warning to these investors in the Press Release preceding the delisting.

102.    Credit Suisse caused Plaintiffs' losses by ignoring the imminent short squeeze, creating a situation where market manipulation was substantially certain to occur.

103.    Credit Suisse controlled the supply, and by extension the price, of the manipulated market during the entire Manipulation Period. At any point during this period Credit Suisse could have announced that it would accelerate DGAZF and/or that it was creating more notes. Instead, Credit Suisse allowed the manipulation to continue unabated, profiting all the way.

D.   Warnings In Prospectus Were Not Sufficient

104.    The Prospectus warns investors generally that DGAZ "may trade at a substantial premium to or discount from" the Index Value under a "variety of circumstances," including "imbalances in the supply and demand of the ETNs . . . as a result of any decision of ours to issue, stop issuing or resume issuing additional ETNs."

105.    A "premium to" connotes some relation to the underlying Index. No reasonable investor would expect that a "premium" would entail a total separation from the Index price whereby trading prices would increase exponentially without regard to the behavior of the Index. This is particularly true insofar as the Prospectus repeatedly states that DGAZ will track the performance of the Index.

106.    Credit Suisse's earlier generalized disclosures of theoretical risks were inadequate as of the date of the Press Release, when market conditions were such that Credit Suisse knew or should have known that the outstanding short interest and lack of liquidity caused by its decision

to delist and stop issuing additional notes would lead to a short squeeze. Cautionary disclosures that the price could be impacted were insufficient in light of the more specific information known to Credit Suisse as of the date of the Press Release.

107.    The Press Release failed to disclose the known conditions and readily foreseeable future events set forth above, causing DGAZ investors who held short positions to reasonably continue to rely on Credit Suisse's statements that DGAZ would continue to track the underlying Index.

**The Named Plaintiff's Experience**

108.    Plaintiff initiated 10 short positions in DGAZ in the last week of May 2020, prior to the delisting date, while DGAZ was still listed on NYSE Arca.

109.    Plaintiff initiated these positions in reasonable reliance on Credit Suisse's statements that DGAZ would function as an ETN, tracking the value of the S&P's GSCI Natural Gas Index ER.

110.    Taking a short position expressed Plaintiff's belief that the Index would increase in the future, thereby causing the price of DGAZ (which was levered 3x inverse to the Index) to decrease and allowing Plaintiff to profit on her short investment.

111.    The price of DGAZ was 99% correlated to the Indicative Value prior to the Press Release.

112.    Plaintiff maintained her short positions following the Press Release in reasonable reliance on the belief that DGAZ would continue to function as an ETN that tracked the underlying Index value.

113.    Plaintiff was forced to purchase DGAZ to cover her short positions during the Manipulation Period at prices greatly in excess of the Indicative Value.

## Class Action Allegations

114.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully stated herein.

115.    Plaintiff brings this action individually and on behalf of all other persons similarly situated (hereinafter referred to as "the Class") pursuant to Federal Rule of Civil Procedure 23.

116.    Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> Any person who initiated a short position in DGAZ prior to the Manipulation Period and purchased DGAZ(F) on the OTC Market during the Manipulation Period to cover that short position, in whole or in part.

117.    Collectively, these persons will be referred to as "Class members." Plaintiff represents, and is a member of, the Class. Excluded from the Class are Defendant, any entities in which Defendant has a controlling interest, and Defendant's agents and employees, and any Judge to whom this action is assigned and any member of such Judge's staff and immediate family.

118.    Plaintiff does not know the exact number of members in the Class, but reasonably believe that Class members number, at a minimum, to be several hundred or more. Further, the Class can be identified easily through records maintained by Credit Suisse and others.

119.    The joinder of all Class members is impracticable due to the number of Class members. Additionally, the disposition of the claims in a class action will provide substantial benefit to the parties and the Court in avoiding a multiplicity of identical suits and inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Class.

120.    The claims of Plaintiff are typical of the claims of the Class she seeks to represent. Plaintiff and other Class members initiated short positions in DGAZ notes issued by Credit Suisse

prior to the Manipulation Period. All purchases were reliant on Credit Suisse's disclosure of risk and on the belief that DGAZ would be traded in a market free from manipulation. The manipulative and misrepresentative acts of Credit Suisse impacted all investors.

121.    There are well-defined, nearly identical, common questions of law and fact affecting all parties that predominate over questions that may affect individual Class members, including but not limited to the following:

     i.   Whether Credit Suisse knew or should have known that a short squeeze was imminent when it announced that DGAZ would be delisted;

    ii.   Whether the Press Release should have disclosed the risk of an impending short squeeze;

   iii.   Whether the Press Release should have disclosed the risk of a price dislocation following the delisting;

   iv.   Whether Credit Suisse should have accelerated repayment of DGAZ notes rather than delisting them;

    v.   Why Credit Suisse made the decision to delist DGAZ and suspend issuance of further notes;

   vi.   The extent to which Credit Suisse benefitted from its decision to delist DGAZ and suspend issuance of further notes.

122.    The focus of these claims is on the conduct of Credit Suisse and its decisions surrounding the delisting of DGAZ, the effect of which did not vary between class members. Resolution of these common questions will drive the claims of all Class members toward judgment or resolution; they involve a "fatal similarity" for purposes of the claims of all Class members.

123.    For all these reasons, a class action is the superior method for the fair and efficient adjudication of this controversy.

124.    Plaintiff and members of the Class have been harmed and continue to be harmed by the foregoing and other acts of Credit Suisse, including the total loss of her investments and additional expenditure for covering positions or having positions liquidated.

125.    Plaintiff seeks damages on behalf of herself and all Class members, including but not limited to, losses incurred covering their short positions during the Manipulation Period, as well as consequential damages in an amount to be proven at trial.

126.    Plaintiff will fairly and adequately represent and protect the interests of the Class and has no interests which are antagonistic to any member of the Class.

127.    Plaintiff has retained counsel experienced in handling class action claims involving fraud and securities violations. Plaintiff's counsel is also experienced in prosecuting the claims of investors against financial institutions who have engaged in manipulative practices.

128.    Class-wide relief is essential to resolve the claims regarding all investors relating to all responsible parties in an equitable, even-handed fashion.

129.    Plaintiff therefore seeks certification of the Class pursuant to Rules 23(b)(1)(A) and (b)(3).

130.    Plaintiff seeks certification of a Rule 23(b)(1)(A) class. Adjudicating Defendant's liability for the facts and claims alleged here poses a substantial risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the Defendant if a class were not certified.

131.    Plaintiff seeks certification of a Rule 23(b)(3) class. As detailed above, common questions regarding Defendant's conduct predominate over any individual issues, and a class action is superior to the alternative of hundreds of individual cases involving the same core facts and claims addressed to Credit Suisse's conduct.

132.    In the alternative, Plaintiff seeks certification of an "issues" class pursuant to Rule 23(c)(4). This class would incorporate, and allow for the adjudication of, all issues the Court adjudges to be common to members of the class, such as one or more of the common issues identified by Plaintiff in ¶ 121, *supra*.

## CAUSES OF ACTION

### COUNT I: VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT OF 1934 and RULE 10b-5 PROMULGATED THEREUNDER

133.    Plaintiff incorporates each of the foregoing paragraphs by reference as if set forth in full herein.

134.    This claim is brought pursuant to § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

135.    At all times relevant hereto DGAZ and/or DGAZF was a "security" within the meaning of the Exchange Act.

136.    As set forth below, Credit Suisse made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the holders of short positions in DGAZ notes.

137.    Credit Suisse approved and disseminated, or caused to be disseminated, the Press Release.

138.    The Press Release was materially false and misleading insofar as it misrepresented and failed to disclose information that a reasonable investor would view as significantly altering the total mix of information available, including but not limited to, the fact that market conditions were such that a short squeeze was imminent, and that the price of DGAZ(F) would become completely dislocated from the underlying Index value.

26

139.     The market for DGAZ was an efficient market all times prior to the effective date of the delisting. DGAZ notes met the requirements for listing on NYSE Arca, a highly efficient and automated securities market. The market for DGAZ promptly digested and reacted to current information regarding the Notes from all publicly available sources, including the Press Release, and reflected—or would have reflected—such information in the prices of the Notes.

140.     Plaintiff maintained her short positions in DGAZF in reliance that the market for DGAZF would continue to be an efficient one free from manipulation, and that DGAZF would continue to trade at prices correlated to the Index value.

141.     Credit Suisse acted with scienter in making the decision to delist and suspend further issuance of DGAZ, insofar as Credit Suisse knew or should have that there was a significant short interest and that market conditions were such that investors in short positions would be subject to a short squeeze.

142.     Credit Suisse acted with scienter by making misleading statements in the Press Release describing the possibility that DGAZ would trade at a discount to the Indicative Value. In reality, Credit Suisse knew or recklessly disregarded the risk, that a short squeeze whereby the price of DGAZ would grow exponentially, totally dislocated from the Indicative value, was substantially certain to occur.

143.     By delisting DGAZ instead of accelerating it, Credit Suisse realized substantial fees that it would not otherwise have realized.

144.     By delisting DGAZ instead of accelerating it, Credit Suisse positioned itself to benefit financially, and did in fact benefit financially, from the impending short squeeze.

145.    Credit Suisse artificially controlled the market for DGAZ and DGAZF from the date the Press Release was issued until the moment trading was halted on August 12, 2020 and Credit Suisse announced that it would accelerate repayment of outstanding DGAZF positions.

146.    Plaintiff was misled to believe the prices at which DGAZF was traded were the product of an efficient market and not rigged by manipulators.

147.    Plaintiff suffered damages as a direct and proximate result of Credit Suisse's conduct because, in reliance on the integrity of the market over which Credit Suisse had sole and ultimate control, she maintained her short positions and ultimately paid artificially inflated prices on the OTC Pink market to cover her outstanding short positions.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all counts so triable.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant Plaintiff and all Class members the following relief against the Defendants:

i.    Awarding all recoverable damages sustained by Plaintiff and the Class;

ii.   Certifying this action to be a proper class action pursuant to F.R.C.P. 23, finding that Plaintiff is a proper representative of the Class, and appointing the lawyers representing Plaintiff as counsel for the Class; and

iii.  Such other relief as the Court deems just and proper.

Dated January 6, 2022            Respectfully submitted,

By: */s/Daniel Centner*_____
**PEIFFER WOLF CARR KANE & CONWAY, LLP**
Joseph Peiffer (jpeiffer@peifferwolf.com)[7]
Daniel Centner (dcentner@peifferwolf.com)
1519 Robert C. Blakes Sr. Drive
New Orleans, LA 70130
Telephone: (504) 523-2434

---

[7] Will seek admission *pro hac vice.*

28

**PEIFFER WOLF CARR KANE & CONWAY, LLP**
Jason Kane (jkane@peifferwolf.com)
95 Allens Creek Bldg. 1, Suite 150
Rochester, NY 14619
585-310-5140

**DAREN A. LUMA, PLLC**
Daren A. Luma
75 South Broadway, Suite 400
White Plains, NY 10601
Telephone: (914) 304-4051
Facsimile: 914-206-5353
dluma@lumalegal.com

*Attorneys for Plaintiff and the Proposed Class*