## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Adelina Gomez, on behalf of herself and all others similarly situated, | Case No. 1:22-cv-00115 |
| *Plaintiff,* | Judge: Hon. John P. Cronan |
| v. | Magistrate Judge: Hon. Barbara C. Moses |
| Credit Suisse AG, | |
| *Defendant.* | |

---

## MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE CLASS ACTION COMPLAINT FOR FAILURE TO STATE A CLAIM

**PEIFFER WOLF CARR KANE CONWAY & WISE, LLP**
Daniel B. Center
Jason J. Kane
1519 Robert C. Blakes Sr. Drive
New Orleans, LA 70130
T: 504-523-2434
dcentner@peifferwolf.com

**DAREN A. LUMA, PLLC**
Daren A. Luma
75 South Broadway, Suite 400
White Plains, NY 10601
T: 914-403-4051
dluma@lumalegal.com

*Proposed Lead Counsel for Lead Plaintiff and the Class*

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 4

ARGUMENT ...................................................................................................................... 9

   I.   Plaintiff Alleges a Claim for Material Misrepresentations and Omissions ..................... 10

     1.   Plaintiff alleges misstatements or omissions of material fact ......................................... 10

     2. Credit Suisse had a duty to disclose information concerning the imminent short squeeze and corresponding price dislocation ................................................................ 17

     3.   The Complaint adequately alleges scienter ................................................................ 19

     4.   The Complaint pleads loss causation .......................................................................... 22

     5. The Complaint adequately alleges scienter

   II.   Plaintiff Has Also Pleaded an Alternative Claim for Market Manipulation ................. 23

   III.   Plaintiff Requests Leave To Amend In The Event Of Dismissal ................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007)........................................ 24

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................................ 9

*City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*, 565 F. Supp. 3d 478  (S.D.N.Y.
    2021................................................................................................................................... 11

*Credit Suisse First Boston Corp. v. ARM Fin. Grp., Inc.*, 2001 WL 300733, at *8 (S.D.N.Y. Mar.
    28, 2001) ......................................................................................................................... 13

*Credit Suisse First Boston Corp. v. ARM Financial Group, Inc.*, 2001 WL 300733, at *8
    (S.D.N.Y. Mar. 28, 2001). .............................................................................................. 15

*Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624 (S.D.N.Y. 2012) ..................... 17

*ECA, Loc. 134 IBEW Jt. Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir.
    2009) ............................................................................................................................... 19

*Foman v. Davis*, 371 U.S. 178 (1962) ......................................................................................... 25

*In re AIG, Inc. 2008 Sec. Litig.*, 741 F.Supp.2d 511 (S.D.N.Y. 2010) ........................................ 15

*In re Am. Int'l Grp. Inc.*, 741 F. Supp. 2d 511 (S.D.N.Y. 2010 ..................................................... 9

*In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 468 (S.D.N.Y. 2008)................................... 21

*In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 410 (S.D.N.Y. 2010) ..................................... 18

*In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423
    (S.D.N.Y. 2011) ......................................................................................................... 11, 15

*In re Blech Secs. Litig.*, 961 F. Supp. 569 (SDNY 1997) ............................................................ 25

*In re Citigroup Inc. Sec. Litig.*, 753 F.Supp.2d at 235................................................................. 19

*In re Direxion Shares ETF Tr.,* 279 F.R.D. 221 (S.D.N.Y. Jan. 27, 2012)*, .......................... 13, 14*

*In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458 (S.D.N.Y. 2012). ................................. 20

*In re Gen. Elec. Sec. Litig.*, 844 F. App'x 388 (2d Cir. 2021 ...................................................... 19

*In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553 (S.D.N.Y. 2014)................................................ 17

*In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272 (S.D.N.Y. 2009) ............................. 18

*In re Van der Moolen Holding N.V. Sec. Litig.,* 405 F.Supp.2d 388 (S.D.N.Y.2005) ................ 15

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005)....................................................... 22

*Loreley Fin (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC,* 797 F.3d 160 (2d Cir. 2015 ............. 25

*Novak v. Kasaks,* 216 F.3d 300 (2d. Cir. 2000), ......................................................................... 19

*Rolf v. Blyth, Eastman Dillon & Co., Inc.,* 570 F.2d 38 (2d Cir.1978 ......................................... 19

*See In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206 (S.D.N.Y. 2010 .................................. 22

*Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60 (S.D.N.Y. 2015) ........................................... 25

*Silberstein v. Aetna, Inc.*, No. 13-CV-8759 AJN, 2015 WL 1424058, at \*8 (S.D.N.Y. Mar. 26,

    2015) ........................................................................................................................................ 16

*Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, (2d Cir.2008) ................................................ 16

*Tecku v. Yieldstreet, Inc.*, No. 20 CIV. 7327 (VM), 2022 WL 1322231, at \*10 (S.D.N.Y. May 3,

    2022......................................................................................................................................... 18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ............................................... 9

*United Paperworkers Intern. Union v. International Paper Co.*, 985 F.2d. 1190....................... 13

*Zlotnick v. TIE Commc'ns*, 836 F.2d 818 (3d Cir. 1988) ............................................................. 12

## Regulations

*Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64 (2d Cir. 2021) ........................................... 13

## Other Sources

*Runaway ETNs Trap Traders in 'Wild West' of Index Investing*

https://www.wsj.com/articles/runaway-etns-trap-traders-in-wild-west-of-index-investing-11603099802.html ................................................................................................................. 2

Plaintiff submits this memorandum in opposition to the *Motion to Dismiss the Class Action Complaint for Failure to State a Claim* filed by Defendant Credit Suisse AG ("Credit Suisse") [Dkt. No. 21] ("Motion").

## I.    <u>INTRODUCTION</u>

This action is not an attempt to make Credit Suisse[1] the "insurer" of a "risky" investment strategy. Rather, it seeks to hold Credit Suisse accountable for destroying the market for its DGAZ product without warning its short sellers of consequences that Credit Suisse knew were virtually certain to follow, resulting in approximately $2 billion in losses.

On June 22, 2020, Credit Suisse issued a press release ("Press Release") stating its plans to (1) delist and (2) suspend further issuance of nine (9) of the company's exchange traded note ("ETN") products. Credit Suisse would continue issuing seven (7) of those ETNs until July 3, 2020; however, issuances for two of these ETNs—DGAZ and UGAZ, both of which offered leveraged exposure tracking a natural gas index—were suspended effective immediately. The combination of the delisting and immediate suspension of further issuances destroyed any and all liquidity in these ETN markets, effectively "breaking" the mechanisms put in place to ensure that the price of the products would achieve their stated objective of "tracking" the underlying gas index. The Wall Street Journal colorfully referred to these illiquid ETNs as "zombie investment product[s]."[2]

As of the date of the Press Release DGAZ had a substantial "short interest," one significantly higher than that of any of Credit Suisse's other ETN products. Moreover, Credit

---

[1] Capitalized terms not otherwise defined herein shall have the meaning assigned in Plaintiff's Class Action Complaint. *See* ECF Doc. 1.

[2]    https://www.wsj.com/articles/runaway-etns-trap-traders-in-wild-west-of-index-investing-11603099802    (last accessed September 30, 2022).

Suisse had almost exclusive control over the supply of DGAZ notes that should have been available to cover those short positions—another situation unique to DGAZ. Under these unique market conditions, the delisting and suspension lead to an inevitable "short squeeze" as short sellers looking to cover their positions had nowhere to turn.

Credit Suisse (and only Credit Suisse) had actual knowledge[3] of three key data points showing that a price dislocation and corresponding short squeeze was inevitable: the total number of DGAZ notes outstanding as of the date of the Press Release; the "short float," or percentage of notes that had been shorted as of that date; and the number of notes held by Credit Suisse as of that date. These numbers can and do vary significantly on even a daily basis, and only Credit Suisse had actual, real-time visibility into these numbers as they existed as of the date of the Press Release.[4]

Notwithstanding this knowledge, the Press Release provided incomplete disclosures and warnings about the risks that were virtually certain to follow. To that end, the Press Release spoke generically as to how the market value of the delisted ETNs "may be influenced by, among other things, the levels of actual and expected supply and demand for the ETNs in the secondary market," and then went on to repeatedly warn investors of scenarios where they "may not able to sell their ETNs in the secondary market at all." The Press Release further cautioned investors against paying a premium over the indicative value of the ETNs, *expressly reinforcing investors' baseline assumption that the price of the ETN should be tethered to that value.*

---

[3] *See* n. 1., *supra,* reciting a quote from a Credit Suisse spokeswoman confirming "that the bank takes the stability of markets and precedent into consideration when deciding how to treat an ETN closure."

[4] Although some of this information is reported periodically to the public, that data is stale by the time it hits the market. Institutional holdings are reported on a quarterly basis (Credit Suisse's holdings) and reflect values approximately 45 days prior to publication; the outstanding short interest is reported on bi-monthly basis and reflects data approximately 10 days prior to publication.

The Press Release contained no discussion whatsoever about how DGAZ was primed for a short squeeze, notwithstanding Credit Suisse's exclusive knowledge of the real time data confirming that it was just a matter of time until one occurred. Nor did Credit Suisse seek to correct the myriad prior statements in the DGAZ prospectus describing how DGAZ was designed to track the value of the underlying gas index.

Instead, Credit Suisse left each and every one of its short interest holders in the dark. Consistent therewith, following the Press Release DGAZ's price became totally dislocated from the index it was supposed to track, leaving short sellers at the mercy of the extremely limited market that eventually reached $25,000 **per note**, all while DGAZ's indicative value (*i.e.*, its defined value based on the underlying gas index) hovered in the $110-$130 range. Brokerages began liquidating these short sellers' accounts, forcing them to cover their positions at these massively inflated prices. One analyst estimated that short sellers took a **$2 billion loss** in a one-week span--$1.68 billion of which was suffered in a single day, August 12, 2020.[5] On that same day, regulators halted trading, but for Plaintiff and the Class members the damage was already done. Adding insult to injury, Plaintiff and the Class members who shorted DGAZ were actually correct in their belief as to the performance of the Index that DGAZ was supposed to track. ECF No. 1, Complaint ("Compl.") ¶ 100. If the product had been managed as intended, these investors would have been looking at profits, not life-changing losses.

II.   **STATEMENT OF FACTS**

DGAZ was an exchange traded note ("ETN") product previously issued by Credit Suisse, AG ("Credit Suisse"). ETNs are daily trading products intended to track the price of an underlying

---

[5]  *Id.*; see also https://www.benzinga.com/analyst-ratings/analyst-color/20/08/17120481/dgazf-short-sellers-lose-2b-on-black-swan-blowout (last accessed September 30, 2022).

index, *i.e.*, a numerical average of specific commodities or securities prices. *Id.* ¶ 2. ETNs track the index price through two interdependent mechanisms: the ability to purchase and redeem notes directly through the issuer at a price based on the note's indicative value (calculated based on the daily settlement prices of the futures contracts included in the applicable index), and, a liquid secondary market that allows arbitrageurs to exploit differentials in market pricing versus issuer pricing. *Id.* ¶ 54. Together these mechanisms combine such that the price of the ETN will track the applicable index as reflected in the ETN's indicative value. *Id.* ¶ 59. Consistent therewith, the DGAZ Prospectus contains consistently and uniformly recites how the product will track the daily performance of the underlying index:

- The ETNs track the daily performance of the S&P GSCI® Natural Gas Index ER (as applicable to the relevant ETN, the "Index,"), as reflected by their Indicative Value, calculated as set forth below.

- Is this the right investment for you? The ETNs may be a suitable investment for you if [y]ou seek exposure to fluctuations in volatility in general and on a leveraged long or leveraged inverse basis, as applicable, to the performance of the Index.

- Is this the right investment for you? The ETNs may be a suitable investment for you if: ….You are willing to accept the risk of fluctuations in the price of natural gas futures in general and in the level of the Index in particular.

- Is this the right investment for you? The ETNs may be a suitable investment for you if: ….You do not seek a direct investment that tracks the spot price of natural gas or to buy or hold natural gas directly, but rather seek exposure to the commodities futures contracts composing the Index tracked by the ETNs.

- The ETNs are not a suitable investment for you if: You do not seek exposure on a 3x leveraged basis to fluctuations in the price of natural gas futures contracts in general and in the performance of the Index in particular…

- The ETNs are not a suitable investment for you if: … You believe the level of the Index will decrease (if you invest in the Leveraged Long ETNs) or increase (if you invest in the Leveraged Inverse ETNs).

- The ETNs reflect a leveraged long or leveraged inverse position, as applicable, in the Index, which tracks a futures contract on a single commodity, and thus are much less diversified than funds, investment portfolios or Index investing in or tracking a broader

range of products. The price of natural futures contracts may not correlate to the price of commodities generally and may diverge significantly from the prices of commodities generally. Because the ETNs are linked to an Index reflecting a concentrated investment, they carry greater risk and may be more volatile than a security linked to the prices of multiple assets or a broad-based index.

*See, e.g.*, Compl. ¶ 52.

Investors who believed the Index would increase over time could "short" DGAZ in an attempt to make a profit. *Id.* ¶ 4. As the Index increased, the price of DGAZ would decrease accordingly, allowing those who shorted it at a higher price to make a profit on the difference between the price at which they borrowed DGAZ and the price they later paid to cover their short. *Id.*

Throughout its existence DGAZ had a substantial short interest. *Id.* ¶¶ 5, 16, 64, 75. These investors relied on the integrity of the DGAZ market to ensure that their notes' values increased or decreased commensurate with the behavior of the Index. *Id.* ¶¶ 6, 107,147. From its inception until it was delisted, DGAZ functioned as it was intended, increasing decreasing in line with the behavior of the Index, with minimal divergence. *Id.* ¶¶ 7, 59. From February 2012 until June 18, 2020, DGAZ's average price was almost identical to the Indicative Value, trading at an average -0.11% discount. *Id.* Minimum and maximum variability during this time period were -9.39% and +12.80%, respectively. *Id.* All told, the correlation of DGAZ's daily price and its daily Indicative Value was 99% over the life of the product prior to the delisting. *Id.* ¶¶ 8, 59.

On June 22, 2020, Credit Suisse announced through the "Press Release" that DGAZ, and certain other ETNs, would be delisted from NYSE Arca on July 10, 2020. *Id.* ¶ 9. That same Press Release also announced that Credit Suisse would suspend further issuances of DGAZ, effective immediately. *Id.* ¶¶ 10, 60. Eventually, outstanding DGAZ units were shifted to an OTC market and traded under a new ticker symbol, DGAZF. *Id.* Together, the delisting, suspension, and Credit

Suisse's ownership of over 100% of outstanding shares completely destroyed DGAZ's liquidity, making it impossible to achieve its sole objective of tracking the Index. *Id*. ¶¶ 11, 78-79, 84.

Historically, in those rare instances when an ETN was delisted and further issuances suspended, the price would trade at a discount to the underlying indicative value, as investors' only other option was to carry outstanding notes until maturity while their value decayed toward zero. *Id.* ¶ 12. Consistent therewith, the Press Release explicitly warned investors that they may not be able to sell their ETNs in the secondary market following the delisting. *Id.* ¶ 13. The Press Release made no mention of the risk that the price of the ETNs would become dislocated entirely from the Indicative Value—that the ETN would no longer function on the terms on which it had been sold—following the Press Release. *Id.* ¶¶ 14, 107. This risk was particularly acute as to DGAZ, for two primary reasons. *Id.* ¶ 15. First, DGAZ had a substantial short interest as of the date of the Press Release, one that was significantly higher than any of Credit Suisse's other ETN products. *Id.* ¶¶ 16, 78-79. In normal circumstances, investors looking to cover their short positions could look to Credit Suisse to issue additional notes; however, since Credit Suisse stopped issuing DGAZ immediately after the Press Release, these investors would have to look elsewhere. *Id.* Second, Credit Suisse had almost exclusive control over the supply of DGAZ shares immediately prior to the effective date of the delisting. *Id.* ¶¶ 17, 71. Data later reported to the SEC shows that as of June 30, 2020 Credit Suisse held 431,350 units of DGAZ, compared to only 305,418 outstanding as of the date of DGAZ's delisting (*i.e.*, June 22, 2020). *Id.* ¶ 71.

In other words, Credit Suisse, after accounting for shares lent to short sellers, held more than 100 percent of the long interest in DGAZ. *Id.* ¶¶19, 84. This made DGAZ unique among the nine ETNs announced for delisting in the Press Release, and indeed, among all leveraged ETNs Credit Suisse had delisted since it started selling ETNs in 2007. *Id.* ¶¶ 20, 74. Credit Suisse's

DGAZ holdings were 70x higher than its interest in DGAZ's companion product UGAZ, and many multiples higher than Credit Suisse's holdings in any of the other ETNs announced for delisting in the Press Release. *Id.* ¶¶ 18, 72. In light of the foregoing, Credit Suisse's decision to delist and stop further issuance of DGAZ units was made with reckless disregard for the very likely, almost certain, risk that a short squeeze and corresponding dislocation between the price of DGAZ and the Index would follow. *Id.* ¶¶ 21, 79. There were simply not enough long positions available from other places to cover outstanding short obligations. *Id.* ¶ 79.

None of this was disclosed in the Press Release and this scenario—a dislocation and a short squeeze—is exactly what occurred after the delisting when DGAZ began trading on an over-the-counter exchange, OTC Pink, under the ticker name DGAZF. *Id.* ¶¶ 23-24, 65. Beginning in early-August 2020, the lack of primary market liquidity and the inability to purchase new shares from Credit Suisse caused the "ask" pricing on DGAZF to become completely dislocated from its Indicative Value. *Id.* ¶ 25. Long positions raised their ask prices higher with each passing hour, regardless of the performance of the underlying Index or the product's Indicative Value. This trend worsened exponentially over the first two trading weeks in August 2020 (the "Manipulation Period"). *Id.* As of August 4, 2020, DGAZF was trading at $600 or higher. Id. ¶¶ 26, 92. Meanwhile, its Indicative Value was approximately $120. *Id.* ¶ 26. This differential increased steadily for the next eight days, reaching peak absurdity on August 12th, when DGAZF prices peaked at approximately $25,000 *per note*. *Id.* ¶¶ 27, 95. By then holders of short positions were facing nearly limitless exposure—an individual who was short only 10 shares of DGAZ (which under normal circumstances would have been less than a $1,500 obligation) was looking at $250,000 or more to cover those ten positions. *Id.* ¶ 27. This entire time DGAZF's Indicative Value hovered in the $110-$130 range. *Id.* ¶¶ 28, 90.

At the end of the day on August 12, 2020, FINRA halted trading on DGAZF. *Id.* ¶¶ 29, 98. After the market closed, Credit Suisse suddenly changed course and announced it was exercising its option to accelerate all outstanding DGAZF ETNs, with investors to receive a cash payment at the average of the closing indicative values of the DGAZF ETNs during the accelerated valuation period between August 14, 2020 to August 20, 2020. *Id.* ¶ 30. By then it was too late for hundreds, if not thousands, of retail investors who had been caught in the short squeeze. *Id.* ¶ 31. Some of the investors caught in the squeeze were able close out their positions at the artificially inflated prices, while others were not so lucky and were hit with margin calls or forced liquidations at whatever the prevailing price happened to be at the time. *Id.* Losses incurred by these short sellers have been estimated at $2 billion.[6]

Plaintiff Adelina Gomez filed this case on January 6, 2022, on behalf of all holders of DGAZ short positions who were caught in the "short squeeze" and purchased DGAZ notes via the OTC market, either voluntarily or involuntarily through a broker liquidation, to cover their short position in August 2020.

Credit Suisse now moves to dismiss, relying heavily upon generic disclosures in its Offering Documents that long pre-date the Press Release and the specific conditions that existed as of its publication. These, and Credit Suisse's other arguments, fail for the reasons set forth below.

### III.   <u>ARGUMENT</u>

To survive a motion to dismiss, a complaint need only allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

---

[6] *See* n. 5, *supra.*

the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In applying this standard, all factual allegations in the complaint are accepted as true and all reasonable inferences are drawn in the plaintiff's favor. *In re Am. Int'l Grp. Inc.*, 741 F. Supp. 2d 511, 528 (S.D.N.Y. 2010); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

Plaintiff alleges Credit Suisse's actions violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, pursuant to which:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

*See* 17 CFR § 240.10b-5.

Section 10(b) thus prohibits two broad categories of conduct—material misstatements, and manipulative acts. *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 75 (2d Cir. 2021)

To state a claim for a material misrepresentation or omission under Section 10(b), a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id.* at 75.

To state a claim for market manipulation a plaintiff must plausibly allege "(1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." *Id.* at 76.

The Complaint alleges claims under both of the foregoing. (Compl. ¶¶ 134-47.) Credit Suisse has moved to dismiss the complaint, arguing that Plaintiff has failed to plead certain of the elements listed above. Those arguments are addressed below.

**A.  Plaintiff Alleges a Claim for Material Misrepresentations and Omissions.**

**1.  Plaintiff Alleges Misstatements of Material Fact.**

Plaintiff alleges the Press Release was materially misleading insofar as it undertook generally to describe potential consequences of the delisting and suspension without disclosing that (1) market conditions were such that DGAZ's pricing would become completely dislocated from the underlying Index Value, and (ii) a corresponding short squeeze was imminent. *See, e.g.*, ¶¶ 67-678, 138, 142.

In response, Credit Suisse argues that the Press Release was not materially misleading because (i) Credit Suisse disclosed the risk of a price dislocation in its offering documents, and (ii) the relevant information necessary to discern the impending short squeeze was in fact available to DGAZ investors.[7]

**2.  The offering documents did not adequately disclose the risk of a dislocation that existed as of the date of the Press Release.**

---

[7] Credit Suisse does not appear to contest materiality—nor could it at this stage, "as the materiality element presents a mixed question of law and fact [that] will rarely be dispositive in a motion to dismiss." *See In re Morgan Stanley Fund Sec. Litig.*, 592 F.3rd 347, 360 (2d Cir. 2010).

Credit Suisse argues that its statements in the Press Release discussing the consequences of delisting and suspension, without disclosing the risk of an impending price dislocation or short squeeze, were not "misleading" in light of various disclosures contained in Credit Suisse's offering documents. *See* Motion at p. 12.

True cautionary language must "warn[ ] investors of *exactly* the risk that plaintiffs claim was not disclosed." *In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 495 (S.D.N.Y. 2011) (emphasis in original). Read as a whole, neither the Press Release nor the offering documents clearly disclose the risk that occurred: that following its delisting and suspension, DGAZ would lose all semblance of connection to its underlying index value and that a short squeeze would ensue.

Indeed, many of the disclosures Credit Suisse now cites are not even relevant to Plaintiff's claims. The quoted statements warning of the consequences of holding ETNs on a long-term basis have no bearing on this suit alleging losses by short sellers, who by definition were not "holding" any positions.[8]  Credit Suisse also cites numerous disclosures simply confirming that it had the right to delist and/or suspend the issuance of new notes. Those likewise do not impact the analysis here—the question is not whether Credit Suisse had the right; the question is whether Credit Suisse misrepresented and/or omitted material information in announcing its exercise of that right in the Press Release.

Further, while the offering documents disclosed that suspension of the issuance of the ETNs "may" materially and adversely affect the price and liquidity of the ETNs in the secondary market, or "may" cause an imbalance in supply and demand which in turn "may" cause the ETNs to trade at a premium.  There general conditional warnings of events that may occur in the future

---

[8] *See Zlotnick v. TIE Commc'ns*, 836 F.2d 818, 820 (3d Cir. 1988) (short positions involve "two separate transactions: the short sale itself and the subsequent covering purchase").

are insufficient.  Because as of the date of the Press Release, a ***specific risk*** had materialized, in the form an imminent short squeeze based on the outstanding short interest, the cessation in creating new shares and Credit Suisse's own DGAZ holdings, representing over 100% of the shares outstanding. As the Second Circuit has explained, "cautionary words about future risk cannot insulate from liability an issuer's failure to disclose that the risk has, in fact, materialized . . . there is a 'critical distinction between disclosing the risk a future event might occur and disclosing actual knowledge that the event will occur'—particularly where that distinction holds 'enormous significance' for investors. *Set Cap.* 996 F.3d at 85. This distinction is important, and fatal to Credit Suisse's suggestion that forward-looking statements in its offering documents, which apply generally to all of its ETN products, completely insulate it against liability on the specific facts of this case.

Additionally, any warnings regarding possible premiums or variance in price are not to be read in a vacuum, but, as Credit Suisse acknowledges, instead need to be viewed as part of the "total mix" of information available to investors. *See, e.g.*, *United Paperworkers Intern. Union v. International Paper Co.*, 985 F.2d 1190, 1198-1199. In determining what goes into this "mix," "[t]he critical question for the Court is not a mere calculation of the number of times the word [premium] or [variance] was used, but rather whether the disclosures sufficiently revealed the magnitude of the risk." *See In re Direxion Shares ETF Tr.,* 279 F.R.D. 221, 232 (S.D.N.Y. Jan. 27, 2012)*, citing Credit Suisse First Boston Corp. v. ARM Fin. Grp., Inc.,* 2001 WL 300733, at *8 (S.D.N.Y. Mar. 28, 2001).

The "total mix" analysis must therefore consider the offering documents as a whole, including their repeated statements that DGAZ was "designed" to provide leveraged exposure "linked to the performance of the S&P GSCI Natural Gas Index ER."  *See, e.g.*, Compl. at ¶ 52.

The offering documents are replete with references underscoring that DGAZ's value is tied to the Index; as Credit Suisse itself described it,

> The market value of the ETNs will be affected by several factors, many of which are beyond our control. We expect that generally **the level of the Index on any day will affect the market value of the ETNs more than any other factor**. Other factors that may influence the market value of the ETNs include, but are not limited to, the **path and volatility of the Index**; the prevailing market prices of options on the Index and other financial instruments **related to the Index**; supply and demand for the ETNs, including inventory positions with any market maker; the volatility of the Index, prevailing rates of interest; the volatility of securities markets; economic, financial, political, regulatory or judicial events that affect the level of the Index or the market price or forward volatility of commodities markets or the futures contracts **included in the Index**; the general interest rate environment; the perceived creditworthiness of Credit Suisse; supply and demand in the listed and over-the-counter commodity derivative markets; or supply and demand as well as hedging activities in the commodity-linked structured product markets.

(Ramesh Dec. Ex. A at p. 54) (emphasis added).

These statements reinforce time and again that the price of a DGAZ note is inextricably connected to the Index and undermine Credit Suisse's argument that its isolated warnings of possible "trad[ing] at a premium over the Indicative Value" were sufficient to meaningfully warn investors of the magnitude of the impending price dislocation under the market conditions that existed as of the press release. *See In re Direxion Shares ETF Tr.*, 279 F.R.D. 221, 232 (S.D.N.Y. 2012) (describing "contra-indicators" that "undercut" disclosures in the context of a claim under § 11 of the Securities Act). In *Direxion*, as here, a defendant-issuer argued that its offering documents did not contain misrepresentations or omissions because of certain "clear disclosures regarding the very issues that are the subject matter of the [complaint]." *Id.* at 232. Reviewing the total mix of available information, the Court found that the document at issue did not disclose "hard facts critical to appreciating the magnitude of the risks described," *id.* at 233, and therefore did not negate the claimed misstatements and omissions. That same analysis applies here; Credit Suisse's disclosures omitted "hard facts critical to appreciating the magnitude" of DGAZ's price

location and impeding short squeeze, and dismissal on the bases of these disclosures is not appropriate.

### 3. The imminent risk of a short squeeze was not disclosed in the Press Release, nor available in public records.

The Press Release specifically undertook to discuss the consequences of the delisting and suspension, noting that these actions "may" affect the market value or liquidity of the ETNs across-the-board. Despite its noncommittal statements, Credit Suisse had actual knowledge specific to DGAZ of both the outstanding short float and its effective control of the entirety of the market. *See, e.g.*, Compl. ¶¶ 78-79. This information, and its consequences, should have been disclosed. *In re AIG, Inc. 2008 Sec. Litig.*, 741 F.Supp.2d 511, 531 (S.D.N.Y. 2010) (even "warnings of specific risks ... do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described.") (*quoting Credit Suisse First Boston Corp. v. ARM Financial Group, Inc*., 2001 WL 300733, at *8 (S.D.N.Y. Mar. 28, 2001)).

The Press Release's partial and incomplete disclosure was insufficient in light of Credit Suisse's possession of information showing that the former "market" for DGAZ was now a rigged game in favor of Credit Suisse, who held over 100% of outstanding shares, and whoever else held long positions. *See ARM Financial Group, Inc.,* No. 99 Civ. 12046, 2001 WL 300733, at *8 (S.D.N.Y. Mar. 28, 2001).*Set Cap.* 996 F.3d at 85 ("cautionary words about future risk cannot insulate from liability an issuer's failure to disclose that the risk has, in fact, materialized"). As this Court and others have noted, "to warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *In re Bear Stearns Companies, Inc. Sec., Derivative, &*

*ERISA Litig.*, 763 F. Supp. 2d 423, 495 (S.D.N.Y. 2011) (*quoting In re Van der Moolen Holding N.V. Sec. Litig.,* 405 F.Supp.2d 388, 400 (S.D.N.Y.2005)).

Credit Suisse's reference to its Form 13F reports do not change this calculus. These are after-the-fact reports published several weeks after the date as of which they are reporting; in other words, the information contained therein is stale as of the date it is issued and therefore does not provide any real-time information to investors. For example, the second quarter 2020 Form 13F that Credit Suisse cites reflected Credit Suisse's holdings approximately as of the delisting date but was not filed until August 12, 2020—the day FINRA suspended trading. No one other than Credit Suisse was privy to this information as of the date of the Press Release.

More broadly, holdings data as reported on Form 13F is but one of many pieces of information that together comprise the universe of information necessary to reveal DGAZ's imminent short squeeze. Other necessary information includes the short float, which is updated twice a month and is nearly two weeks old (stale) before it is published, as well as total shares outstanding (which, though publicly available, changes on a daily basis, often dramatically[9]).

At best, Credit Suisse's Form 13F reports are simple snapshots of a single piece of data as a prior a moment in time. They are not real time data sources, and were not sufficient to accurately apprise Plaintiff and the class of DGAZ's market conditions as of the date of Press Release. As such, they are not fairly included as part of the "total mix" of information analysis. *See United Paperworkers*, 985 F.2d. at 1198-1199. In *United Paperworkers*,. In that case the Second Circuit found that even a Form 10-K was not part of the "reasonably available" total mix insofar as it was simply filed with the SEC and not distributed to shareholders. Id. at 1199 ("Corporate documents

---

[9] For example, from 6/1/20 to 6/2/20, shares outstanding decreased by more than 400,000 notes, representing 50 percent of the total. This volatility is not surprising for a product like DGAZ that is not intended to be held as a long term investment.

that have not been distributed to the shareholders entitled to vote on the proposal should rarely be considered part of the total mix of information reasonably available to those shareholders"); *cf. Silberstein v. Aetna, Inc.*, No. 13-CV-8759 AJN, 2015 WL 1424058, at *8 (S.D.N.Y. Mar. 26, 2015) ("The fact that a shareholder with infinite time and an inclination to undertake fishing expeditions might have discovered the violation does not put any reasonable shareholder on notice."). Against this backdrop, using Form 13F reports to charge DGAZ investors with knowledge of facts sufficient to disclose an impending short squeeze is not "reasonable."

Nor do the two "media" sources Credit Suisse cites otherwise make it reasonable to charge DGAZ investors with knowledge of the impeding short squeeze. As *United Paperworks* suggested, information must be "widely reported in readily available media" to be considered part of the "total mix" of reasonably available information. *Id.*; *see*. See *also Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 431 (2d Cir.2008) (explaining that an article in a trade newspaper implicating the defendant by name did not necessarily place a reasonable investor of ordinary intelligence on notice of the probability of fraud).  A crowd-sourced blog post or a blurb on a "Yahoo!" page[10] are not the Wall Street Journal, and suggesting that one or both of these sources to charge Plaintiff with knowledge that a short squeeze would occur some seven to ten months after these articles were published is not "reasonable." Indeed, similar to the problem with relying on the stale data reported on Credit Suisse' Form 13F reports or in bi-monthly short interest reports, articles describing conditions as they existed in September 2019 or November 2019 are virtually useless when talking about market conditions in June 2020, when DGAZ was delisted, new issuances suspended, and with Credit Suisse owning over 100% of outstanding shares. Again, only Credit Suisse had the data showing real time market conditions as of the date of the Press Release.

---

[10] *See* Motion. at p. 13.

### 4. Credit Suisse had a duty to disclose information concerning the imminent short squeeze and corresponding price dislocation.

"Once a party chooses to speak, it has a duty to be both accurate and complete." *Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 646 (S.D.N.Y. 2012); *see also In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 572 (S.D.N.Y. 2014).

Credit Suisse argues the Press Release did not create a duty to disclose accurate or complete information about the consequences of the delisting and suspension because these consequences are not "sufficiently connected" to the Press Release. Motion. at p. 16. Review of the actual language in the Press Release belies this contention. *See* Compl. at ¶ 67. Credit Suisse chose in the Press Release to specifically address the market consequences of delisting and suspending DGAZ. *Id.* (describing how delisting and suspension may "influence market value and liquidity and further noting that "investors may not be able to sell their ETNs in the secondary market at all."). Once Credit Suisse made that choice, it had a duty to communicate all of the information known to it on the subject, including the unique market conditions—in the form of the extreme short interest, and the fact that Credit Suisse (which would no longer sell notes) effectively controlled the entire inventory of notes ostensibly available to short sellers looking to cover their position—that existed as of the date of the Press Release, and how they would combine to create the short squeeze and corresponding price dislocation that subsequently occurred.

As set forth in the preceding section, Credit Suisse failed to do so, opting instead to offer only limited statements about how the delisting and suspension "may influence" market value and/or liquidity. This milquetoast warning was grossly insufficient in light of the magnitude of the potential losses realized as a result of the short squeeze, which totaled $2 billion or more.

Separate and apart from the above, Credit Suisse in the Press Release had a duty to correct the numerous, now untrue, statements in the Prospectus stating that DGAZ's pricing was "linked"

17

to and "designed" to track the Index, such that Credit Suisse "expect[ed] the level of the Index on any day will affect the market value of the ETNs more than any other factor." Once DGAZ was delisted and new issuances suspended, this was no longer the case, as the rush to cover outstanding short positions became the primary factor affecting that pricing. This created an independent duty for Credit Suisse to disclose that its prior statements in its offering documents regarding DGAZ's market pricing were no longer valid.[11]   The Press Release explicitly referenced the Prospectus, but failed to correct those misstatements.

### 5.   The Complaint adequately alleges scienter.

Credit Suisse next challenges the Complaint's allegations of scienter.

A strong inference of scienter "can be pleaded with adequate particularity through allegations showing either '(1) that defendant[] had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness.'" *In re Gen. Elec. Sec. Litig.*, 844 F. App'x 385, 388 (2d Cir. 2021) (quoting *ECA, Loc. 134 IBEW Jt. Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009)).

Both are alleged here.

### a. Credit Suisse's failures to disclose were reckless

"In securities cases, the Second Circuit has defined recklessness as "at the least, conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Novak v. Kasaks,* 216 F.3d 300, 308 (2d. Cir. 2000),

---

[11] *See Tecku v. Yieldstreet, Inc.*, No. 20 CIV. 7327 (VM), 2022 WL 1322231, at *10 (S.D.N.Y. May 3, 2022); *In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 410 (S.D.N.Y. 2010) (defendant had "continuing duty to update or correct past statements when they became known to be misleading."); *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 301 (S.D.N.Y. 2009) (holding "duty to update applies to 'a statement made misleading by intervening events, even if the statement was true when made.")

(*quoting Rolf v. Blyth, Eastman Dillon & Co., Inc.,* 570 F.2d 38, 47 (2d Cir.1978) (ellipsis in original)). As the *Novak* court explained:

> [S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have **specifically alleged defendants' knowledge of facts or access to information contradicting their public statements**. Under such circumstances, defendants knew or, more importantly, **should have known that they were misrepresenting material facts** related to the corporation.

*Novak,* 216 F.3d at 308.

As set forth above, Credit Suisse had exclusive, real-time knowledge of the three data points—total shares outstanding; short interest; and Credit Suisse's holdings—establishing the inevitable short squeeze and price dislocation. *See, e.g.*, Compl. ¶¶ 69-72, 77-79. This is sufficient to establish recklessness, and thus scienter, under *Novak*.[12]

Credit Suisse's arguments in opposition miss the mark. Credit Suisse argues that the Complaint's references to the "uniqueness" of DGAZ suggest that a short squeeze and corresponding price dislocation was somehow not foreseeable. Motion. at p. 22. To the contrary, what made DGAZ unique, or historic, among Credit Suisse's other ETNs was the size of the outstanding short interest, and the fact that Credit Suisse's had effective total control over the shares available to cover those short positions—the very facts that made a short squeeze not only foreseeable, but imminent.

Credit Suisse further argues that the publicly-available information discussed above concerning DGAZ's outstanding short interest somehow undermines Plaintiff's argument that a short squeeze was imminent; according to Credit Suisse, if a short squeeze was indeed obvious, every investor would have realized that following review of Credit Suisse's Form 13F report and

---

[12] *See also In re Citigroup Inc. Sec. Litig.*, 753 F.Supp.2d at 235 ("Citigroup, as the underwriter of the CDOs it held, knew the inputs and assumptions that went into creating these assets and thus was in the best position to recognize the threats they faced as the subprime mortgage market deteriorated.").

exited their positions accordingly. Motion. at pp. 22-23. On this basis Credit Suisse accuses Plaintiffs of a "fraud by hindsight" theory. "The incantation of fraud-by-hindsight will not defeat an allegation of misrepresentations and omissions that were misleading and false at the time they were made." *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 476 (S.D.N.Y. 2012).), aff'd, 525 F. App'x 16 (2d Cir. 2013). Moreover, while Credit Suisse accuses Plaintiff of pleading fraud via "crystal ball," in reality Credit Suisse is guilty of that trope insofar as it suggests Plaintiff should have predicted the ensuing short squeeze on the basis of stale Form 13F reports and obscure internet articles that were effectively useless in terms of forecasting market conditions on the date of the Press Release.  Rather, as noted above, Credit Suisse was the only entity that had all of the necessary information to know that a short squeeze was imminent, including the real-time knowledge that it held over 100% of outstanding DGAZ shares as of the date of the Press Release.

### b.   The Complaint also alleges motive and opportunity.

Plaintiff also alleges scienter via the alternative "motive and opportunity" prong. A complaint has sufficiently alleged a "strong inference" of a "motive and opportunity to commit fraud" if it pleads facts showing that the defendant "benefited in some concrete and personal way from the purported fraud." *Novak*, 216 F.3d at 308

Opportunity to commit fraud is generally assumed where the defendant is a corporation or corporate officer. *See, e.g., In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 468 (S.D.N.Y. 2008). Credit Suisse instead argues "motive," advancing a glib "too big to care" narrative suggesting that as one of the world's largest financial institutions Credit Suisse could not possibly have had a motive to conceal an impending short squeeze to realize $1.5 million in fees. Motion at p. 20. This assertion rings false, as institutions act through individuals for whom motive can take many forms.

As an extension thereof, Credit Suisse's suggestion that the Complaint alleges only a generic "corporate profit" motive focuses too narrowly on the concept of "investor fees." The Complaint is more nuanced, describing Credit Suisse's options to either accelerate the DGAZ notes—thus coming up with a cash payment to each and every outstanding investor as of the acceleration date (*see, e.g.*, Compl. ¶¶ 30, 58, 62)—or leave the product to "die on the vine," which would both save this cash payment and allow Credit Suisse to realize continued daily investor fees, potentially until 2032 (*see, e.g.*, ¶¶ 82-83). By delisting DGAZ instead of accelerating it, Credit Suisse thus positioned itself to benefit financially, regardless of whether it sold (or later intended to sell) into the ensuing short squeeze. The prospect of continuing to realize daily investor fees (regardless of size) as opposed to having to outlay cash to wind down its DGAZ product, is a plausible explanation for Credit Suisse's actions.

Discovery should confirm Credit Suisse's true motive, but even assuming, *arguendo*, it does not, the strong circumstantial evidence of recklessness discussed *supra* is sufficient to survive this motion to dismiss.

### 6. The Complaint pleads loss causation.

Loss causation simply requires a link between the alleged misconduct and the ultimate economic harm suffered by the Plaintiff.  The Second Circuit has found this is satisfied by allegations that "the loss [was] foreseeable and that the loss [was] caused by the materialization of the concealed risk." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).

Plaintiffs have satisfied these requirements here. As set forth above, the short squeeze and corresponding price dislocation were readily foreseeable based on market data information known exclusively to Credit Suisse. Neither this information, nor the impending squeeze or dislocation, was disclosed to investors in the Press Release. These very risks came to light only forty days

following the Press Release, when a historic short squeeze caused the price of DGAZ to rise to more than $25,000 per note, resulting in nearly $2 billion in losses. By then it was too late, as Plaintiff and the class members had lost their chance for an orderly exit prior to the effective date of the delisting.

These allegations are all that is required at this stage, as loss causation is not subject to the heightened pleading standards of Rule 9(b) or the PSLRA.[13]

Credit Suisse offers an alternative causation theory positing that Plaintiff's losses were caused by the fact that she supposedly "held" her DGAZ positions for 78 days, in derogation of the Prospectus's clear warnings not to do so. Motion. at pp. 24-25. This argument misstates the two-step nature of a short sale. Plaintiff sold her positions as the first step. Thereafter, she was not holding anything; rather, she relied on the integrity of the market to function as promised so that when the time was right she could close our her position. On these bases Plaintiff has adequately pleaded loss causation and Credit Suisse's challenge on this basis should be denied.

### B.  Plaintiff Has Also Pleaded an Alternative Claim for Market Manipulation.

Separate and apart from the above, Plaintiff also alleges a claim under Section 10(b)'s prohibition on the use of a "manipulative or deceptive device or contrivance."  To state a claim for market manipulation under Section 10(b), a plaintiff must plausibly allege "(1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." *Set Cap.,* 996 F.3d at 76.

---

[13] *See In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 234 (S.D.N.Y. 2010) ("Loss causation need not be pled with particularity."). Instead, a short and plain statement suffices, as required under Rule 8 of the Federal Rules of Civil Procedure. *Tecku,* 2022 WL 1322231 at *13.

Credit Suisse has challenged the first element, manipulation.[14] As the Second Circuit (and Supreme Court) has observed, the word "manipulative" is "virtually a term of art when used in connection with securities markets." *Id.* It "refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity," and "connotes intentional or willful conduct designed to deceive or defraud investors by **controlling or artificially affecting the price of securities."** *Id. (emphasis added.)* For market activity to "artificially" affect a security's price, courts generally ask whether the transaction or series of transactions "sends a false pricing signal to the market" or otherwise **distorts estimates of the "underlying economic value" of the securities traded**. *Id. (emphasis added.)* While a defendant may manipulate the market through open-market transactions, some misrepresentation or nondisclosure is required. Deception is the gravamen of a claim for market manipulation, and "the market is not misled when a transaction's terms are fully disclosed." *Id.* at 77.

Plaintiff's complaint alleges facts fitting within the pliable definition of the term "manipulative." DGAZ was "designed" to function through a combination of market trading activity and new issuances. (*See, e.g.*, Compl. ¶ 2.) These options were limited and eliminated as a result of the reckless decision to delist and suspend DGAZ. When combined with Credit Suisse's ownership of over 100% of the outstanding interests, this created an artificial market where Credit Suisse had effective total control over the "market" but refused to operate it efficiently, if at all. *Id.* at ¶¶ 34, 80, 141, 145. These acts resulted in a complete "distortion," or dislocation, between the market pricing and the actual underlying economic value (i.e., the Indicative Value) of DGAZ notes. *Id.* at ¶¶ 21, 93. Though all of this took place on the open market, key data points—in the

---

[14] Additional pertinent elements, *e.g.*, scienter, are discussed above, while others (damages, reliance on an efficient market free of manipulation, etc.) are alleged and not challenged. *See, e.g.*, ¶¶ 139-40; 145-47.

form of the extent of the outstanding short float and Credit Suisse's control over the positions necessary to cover that short interest as of the date of the Press Release—were not publicly available, and Credit Suisse recklessly and/or intentionally concealed the risks of a consequent short squeeze and price dislocation, all as described in more detail above. As a result of all of this, long positions were sold for a grossly manipulated $25,000 per note, compared to an Indicative Value of $110-$130, causing an estimated $2 billion in losses. *See id*. at ¶¶ 27-28.

These allegations suffice, for pleading purposes, to state a claim for market manipulation under 10(b). *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007) ("This test will be satisfied if the complaint sets forth, to the extent possible, "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue."); *see also In re Blech Secs. Litig*., 961 F. Supp. 569. 580 (SDNY 1997) (Because "the exact mechanism of the scheme is likely to be unknown to the plaintiffs, allegations of the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants are sufficient for alleging participation."); *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60. 83 (S.D.N.Y. 2015) ("It is important to note that a manipulation claim need not be pleaded to the same degree of specificity as a misrepresentation claim when relevant information is likely to be solely within the defendant's knowledge.")

### C. **Plaintiff Requests Leave To Amend In The Event Of Dismissal.**

If the Court concludes that additional factual pleading is required, Plaintiff respectfully requests leave to amend. Generally, leave to amend "should as the rules require, be freely given." *Foman v. Davis*, 371 U.S. 178, 182 (1962). Therefore, absent "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments

previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment," the moving party should be allowed to test his claim on the merits. *Id.*; *see also Loreley Fin (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC,* 797 F.3d 160, 190 (2d Cir. 2015) ("[W]e hew to the liberal standard set forth in Rule 15, which states that 'the court should freely give leave to [amend] when justice so requires.' As we have explained, the 'permissive standard' of Rule 15 is 'consistent with our strong preference for resolving disputes on the merits.'" (citations omitted)).

Given that Plaintiff has not previously amended her complaint, leave to amend would be especially warranted in the interests of justice and so that she can have the "critical . . . [benefit] of a definitive ruling," *see Loreley Fin (Jersey) No. 3 Ltd,* 797 F.3d. at 190, to guide her as to any deficiencies in her complaint.

Dated: September 30, 2022            Respectfully submitted,

**PEIFFER WOLF CARR KANE CONWAY & WISE, LLP**

Daniel B. Centner
Jason J. Kane
1519 Robert C. Blakes Sr. Drive
New Orleans, LA 70130
T: 504-523-2434
dcentner@peifferwolf.com

**DAREN A. LUMA, PLLC**

/s/ Daren A. Luma
Daren A. Luma
75 South Broadway, Suite 400
White Plains, NY 10601
T: 914-403-4051
dluma@lumalegal.com

*Proposed Lead Counsel for Lead Plaintiff and the Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was served on all counsel of record on this 30th

day of September, 2022 through operation of the Court's CM/ECF system.

_____/s/ *Daren A. Luma*_____
Daren A. Luma