UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------X
                                                    :

ADELINA GOMEZ,                            :

                               :

                 Plaintiff,           :

                               :             22 Civ. 115 (JPC) (BCM)

        -v-                       :

                               :             <u>OPINION AND ORDER</u>

                               :

CREDIT SUISSE AG,                    :

                               :

                 Defendant.       :

                               :

--------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

        This putative securities class action, brought pursuant to Section 10(b) of the Securities

Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Securities and Exchange

Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, centers around the practice known as

"short selling."  A short sale is when an investor borrows a security to sell on the open market in

a bet that when it comes time to "cover" the sale (*i.e.*, to repurchase the same security and return

it to the creditor), the price of the security will be lower than the price at which the investor sold

it.  As the Second Circuit has explained, "the decision to engage in short trading . . . is generally a

decision to forgo safer interest-bearing opportunities in order to seek out higher returns, albeit at

greater risk." *Levitin v. PaineWebber, Inc.*, 159 F.3d 698, 702 (2d Cir. 1998).  Unfortunately for

Plaintiff Adelina Gomez, the risk did not pay off.

        Plaintiff held ten short positions in Defendant Credit Suisse's VelocityShares 3x Inverse

Natural Gas Exchange Traded Notes ("ETNs") linked to the S&P GSCI Natural Gas Index ER (the

"DGAZ ETNs" or "DGAZ").  After Defendant issued a press release on June 22, 2020 (the "Press

Release") announcing its decision to suspend further issuance of and to delist DGAZ, the price of

DGAZ ETNs began to spike, forcing some short sellers, including Plaintiff, to cover their positions at a loss—a phenomenon known as a "short squeeze."  Plaintiff sued, alleging that Defendant's failure to disclose the risk of a short squeeze in the Press Release was a material omission, and that its decision to delist DGAZ rather than to accelerate it constituted market manipulation in violation of the Exchange Act.  Before the Court is Defendant's motion to dismiss.  In light of Defendant's robust risk disclosures in the DGAZ SEC filings, supplemented by thorough disclosures in the June 22, 2020 Press Release, and the publicly available information concerning the large short interest in DGAZ, Plaintiff fails to allege a material misstatement or omission.  Nor does Plaintiff plausibly allege a manipulative scheme or an inference of scienter.  Accordingly, Defendant's motion to dismiss is granted.

## I. Background[1]

### A.    DGAZ ETNs

On February 7, 2012, Defendant began issuing the DGAZ ETNs.  Compl. ¶ 48; *see also* Offering Documents at 3.  ETNs are debt securities "intended to track the price of an underlying

---

[1]  The following facts, which are assumed true for purposes of this Opinion and Order, are taken from the Complaint, Dkt. 1 ("Compl."), as well as documents incorporated by reference therein, including the June 22, 2020 Press Release, Dkt. 22-2 ("Press Release"), and the DGAZ registration statement, prospectus, prospectus supplement, and a series of pricing supplements filed with the SEC pursuant to 17 C.F.R § 230.424(b)(2), Dkt 22-1 ("Offering Documents").  *See Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 141 (2d Cir. 2011) (explaining that on a motion to dismiss pursuant to Rule 12(b)(6), the court must "assum[e] all facts alleged within the four corners of the complaint to be true, and draw[] all reasonable inferences in plaintiff's favor"); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002) ("[O]n a motion to dismiss, a court may consider documents attached to the complaint as an exhibit or incorporated in it by reference . . . ." (internal quotation marks omitted)); *see also Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) ("For purposes of a motion to dismiss, we have deemed a complaint to include . . . public disclosure documents required by law to be, and that have been, filed with the SEC . . . ."); *accord Moab Partners L.P. v. Macquarie Infrastructure Corp.*, No. 21-2524, 2022 WL 17815767, at *1 (2d Cir. Dec. 20, 2022).  All pincites to the Offering Documents refer to the ECF page numbers.

index, *i.e.*, a numerical average of specific commodities or securities prices."  Compl. ¶¶ 2, 43.

The DGAZ ETNs were issued as triple leveraged products to track the S&P GSCI Natural Gas

Index ER (the "Index")—an index calculated by S&P Dow Jones that tracks the performance of a

varying amalgamation of short-term natural gas futures contracts.  *Id.* ¶¶ 48, 52; Offering

Documents at 3-4.  Defendant issued new DGAZ ETNs on the NYSE Arca Exchange at a price

based primarily on the daily economic value of the Index (the "Indicative Value").  Compl. ¶¶ 3,

49.  Defendant also earned a daily investor fee on each DGAZ ETN calculated based on the prior

day's closing Indicative Value of the Index.  Offering Documents at 5.[2]  DGAZ was set to mature

in 2032, but "due to a combination of daily resetting leverage and Credit Suisse's daily investor

fee, the price of the note would decay toward zero over time," *id.* ¶ 57, and thus DGAZ was not

intended to be a "buy and hold" investment.  Offering Documents at 2; Compl. ¶ 57.  Rather,

investors could resell DGAZ on the secondary market, or redeem blocks of 25,000 or more notes

of DGAZ with Defendant for their Indicative Value.  Compl. ¶¶ 55, 58; Offering Documents at

39.  Defendant retained the unfettered right to (a) suspend issuance of new DGAZ ETNs, Offering

Documents at 3, (b) delist DGAZ from the NYSE Arca Exchange, *id.* at 50, or (c) "accelerate' the

notes whereby [Credit Suisse] purchases all outstanding notes at the average Indicative [V]alue

for a specified continuous five day period," Compl. ¶ 58.

DGAZ ETNs were designed to provide investors with inverse triple leveraged exposure to

the Index.  Compl. ¶ 3; Offering Documents at 2.  Any increase in the value of the Index would

---

[2] According to the factual allegations in the Complaint, the daily investor fee was equal to approximately 1.65 percent annualized or "approximately $1.5 million annually based on the shares outstanding and Indicative Value as of the Press Release."  Compl. ¶ 36.  While the Court accepts this factual allegation as true at this motion to dismiss stage, Defendant represents in its motion that this figure is likely inaccurate and overstated given the daily fluctuations in the Indicative Value and that Defendant itself held a substantial inventory of DGAZ ETNs.  Dkt. 21 ("Motion") at 9 n.8.

result in a threefold decrease in the value of DGAZ, and vice versa.  Offering Documents at 2.
Therefore, investors who believed the value of the Index would decrease over time could buy
DGAZ ETNs and realize a threefold increase in their value corresponding to any decrease in the
Index. Compl. ¶¶ 3, 46.  Conversely, those who believed the Index would increase over time could
initiate short positions in DGAZ, borrowing and selling DGAZ at a higher price when the Index is
down, and then repurchasing DGAZ at a lower price to cover the short when the Index is up,
thereby realizing a profit.  *Id.* ¶¶ 4, 47.

Because investors could buy DGAZ ETNs from or redeem DGAZ ETNs with Defendant
at the Indicative Value, the market price of DGAZ generally tracked its Indicative Value for most
of its life.  *Id.* ¶ 59.  Indeed, from February 2012 until June 2020, DGAZ's average price was
almost identical to its Indicative Value.  *Id.* ¶¶ 7, 59.  In addition, there was substantial short
interest in DGAZ.  *Id.* ¶¶ 5, 16, 64, 75.

**B.      The Offering Documents**

"DGAZ was offered pursuant to a registration statement, prospectus, prospectus
supplement, and a series of pricing supplements, each of which was filed with the SEC pursuant
to Rule 424(b)(2)."  *Id.* ¶ 50; *see generally* Offering Documents.  The Offering Documents contain
extensive risk disclosures.  As relevant here, the Offering Documents make four general categories
of warnings:

1.  DGAZ is intended only for sophisticated investors and only to be held for less than
    a day.  *See, e.g.*, Offering Documents at 2 ("***If you hold the ETNs for more than
    one day, it is possible that you will suffer significant losses in the
    ETNs*** . . . .  **Accordingly, the ETNs should be purchased only by sophisticated
    investors who understand the Index and the consequences of investing in the**

4

**ETNs that are designed to provide [three-times leveraged exposure] to the daily performance of the Index.**" (emphasis in original)), 31 ("**You could potentially lose the full value of your investment within a single day. The ETNs are not suitable for investors with an investment term of more than a single day.** The ETNs are not intended to be 'buy and hold' investments. . . . **If you hold the ETNs as a long-term investment, you may lose all or a substantial portion of your investment. The ETNs should be purchased only by knowledgeable investors who understand the potential consequences of an investment linked to the Index and of seeking daily compounding leveraged . . . inverse investment results** . . . ." (emphasis in original)).

2.  While DGAZ ETNs are intended to "track the daily performance" of the Index, "as reflected by their Indicative Value," *id.* at 3; *see also* Compl. ¶ 52, "[t]he trading price of the ETNs at any time may vary significantly from the Indicative Value of such ETNs at such time because the market value reflects investor supply and demand for the ETNs," Offering Documents at 20. *See, e.g.*, *id.* at 43-44 ("A premium or discount in the trading price of the ETNs as compared to their Indicative Value can arise quickly and under a variety of circumstances[,] [f]or example, . . . due to imbalances in the supply and demand of the ETNs (including as a result of any decision of [Credit Suisse] to issue, stop issuing, or resume issuing additional ETNs)."), 65 ("**The actual trading prices of the ETNs at any time may vary significantly from the Intraday Indicative Values of such ETNs at such time. The trading price of any ETNs at any time is the price that you may be able to sell your ETNs [for] in the secondary market at such time, if one exists.**"

(emphasis in original)), 76 ("[T]he decrease in supply may cause an imbalance in the market supply and demand, which may cause the ETNs to trade at a premium over the Indicative Value of the ETNs."); *see also id.* at 3 (citing risk factor advising that "[t]he ETNs may trade at a substantial premium to or discount from the Closing Indicative Value and/or Intraday Indicative Value" (emphasis removed)), 4 (same), 5 (same), 6 (same), 11 (same), 15 (same), 20 (same), 43 (same), 46 (same).

3.   Defendant had unfettered discretion to suspend further issuance of DGAZ which could impact the supply of and demand for DGAZ thereby pumping the price at a premium over DGAZ's Indicative Value.   *See, e.g.*, *id.* at 3 (noting that Credit Suisse is "under no obligation to issue or sell additional ETNs at any time . . . . **Any limitation or suspension on the issuance of the ETNs may materially and adversely affect the price and liquidity of the ETNs in the secondary market. Alternatively, the decrease in supply may cause an imbalance in the market supply and demand, which may cause the ETNs to trade at a premium over the Indicative Value of the ETNs**" (emphasis in original)), 41-42 (listing as a "factor" that could "influence the market value of the ETNs . . . . supply and demand for the ETNs in the secondary market, including but not limited to, our inventory positions or those of any market marker or other person or entity who is trading the ETNs and any decision we make not to issue additional ETNs or to cease or suspend sales of ETNs from inventory, or the subsequent resumption of any such activity (supply and demand for the ETNs will be affected by the total issuance of ETNs, and we are under no obligation to issue additional ETNs to increase the supply)"), 45 ("**Any limitation or suspension on the issuance or sale**

**of the ETNs may impact the trading price of the ETNs, including by creating a premium over the Indicative Value of the ETNs that may be reduced or eliminated at any time**." (emphasis in original)); *see also id.* at 11 (similar), 42-45 (similar), 76 (similar).

4. Defendant "may elect, in [its] sole discretion to discontinue the listing of [DGAZ] on any exchange" including "NYSE Arca," and that such a decision could be made "at any time and for any reason, including in connection with a decision to discontinue further issuances and sales of [DGAZ]." *Id.* at 50; *see also id.* at 2 ("We have no obligation to maintain any listing on NYSE Arca or any other exchange or quotation system."), 10 (same), 21 (same), 24 ("We are not required to maintain any listing of the ETNs on NYSE Arca or any other exchange or quotation system.").

**C.     The Press Release**

On June 22, 2020, Defendant issued the Press Release, "announc[ing] its intent to delist and suspend further issuance of" nine ETN products including DGAZ.  Compl. ¶¶ 10, 60; *see generally* Press Release.  Specifically, Defendant announced that it would suspend issuing new shares of DGAZ effective immediately, and that it would delist DGAZ from the NYSE Arca Exchange effective July 10, 2022. Compl. ¶¶ 9-10, 60; *see also* Press Release at 2.  Defendant made the decision "with a view to better align its product suite with its broader strategic growth plans."  Press Release at 2.  Moreover, the Press Release noted that "[a]lthough it is not currently accelerating the ETNs at its option, Credit Suisse AG continues to have the right to do so, as described in the pricing supplement for the ETNs . . . and may choose to accelerate the ETNs at its option in the future . . . including shortly after delisting." *Id.*

The Press Release contained a reminder that "[a]s disclosed in the Risk Factors section of the Pricing Supplement, the market value of the ETNs may be influenced by, among other things, the levels of actual and expected supply and demand for the ETNs in the secondary market," and that "this announcement and the delisting and suspension of further issuance of the ETNs . . . may influence the market value of the ETNs." *Id.* "For example, delisting the ETNs will remove the primary source of liquidity for the ETNs and investors may not be able to sell their ETNs in the secondary market at all." *Id.* Moreover, the Press Release made clear that "suspending further issuance of the ETNs may adversely affect liquidity for any secondary market that may develop following delisting," but that Defendant could not "predict with certainty what impact, if any, these events will have on the public trading price of the ETNs." *Id.* And so, the Press Release "cautioned" investors "that paying a premium purchase price over the indicative value of the ETNs could lead to significant losses." *Id.* However, the Press Release did not specifically mention any "particularized risks that would ensue" related to DGAZ's "substantial short interest," such as "the risk that the price of the ETN could wholly separate from its indicative value—not just trade at a discount (or a premium) to that value," even though there was more than $135 million in outstanding short interest. Compl. ¶¶ 64, 68.

## D.    Aftermath

Consistent with the Press Release, Defendant suspended issuance of DGAZ notes on June 22, 2020. *Id.* ¶ 86. DGAZ traded on the NYSE Arca Exchange up to and including July 10, 2020. *Id.* ¶ 87. It then began trading over-the-counter on the "OTC Pink" exchange, under the new ticker name DGAZF. *Id.* "Historically, in those rare instances when an ETN is delisted and further issuances suspended, the price will trade at a discount to the underlying indicative value," since investors with smaller holdings will typically be forced to sell their ETNs at a discount to investors

with larger holdings who can meet the redemption threshold (here, 25,000 notes), or be left carrying "outstanding notes until maturity while their value decays toward zero." *Id.* ¶ 12; *see also id.* ¶ 65. In fact, according to the Complaint, this is precisely what happened when Defendant delisted a different ETN in 2016. *Id.* ¶ 66.

DGAZ, however, was unique among the ETNs delisted by Credit Suisse in two respects. First, as mentioned above, DGAZ had substantial short interest. *Id.* ¶¶ 5, 16, 64, 68-69, 75. In fact, "at the time of delisting outstanding short interests for DGAZ were more than $135 million, a substantial portion of which was held by retail investors." *Id.* ¶ 68. *But see id.* ¶ 94 (alleging that the outstanding DGAZ shorts were worth "$130 million"). Second, according to "data reported to the SEC," Defendant held more DGAZ shares in its inventory than the total number of outstanding shares in public circulation. *Id.* ¶ 17. Defendant's holdings of 431,350 units of DGAZ in comparison to the 305,418 outstanding was exponentially higher than its holdings in any of the other delisted ETNs. *Id.* ¶ 18. Thus, alleges Plaintiff, "Credit Suisse had exclusive control over the supply of DGAZ shares immediately prior to the effective date of the delisting." *Id.* ¶¶ 17, 71. And so, whereas usually when an ETN is delisted market forces push toward sales, given DGAZ's substantial short interest, most investors were looking to buy to cover their short positions. However, the supply of DGAZ was significantly depleted given that Credit Suisse, who held more shares of DGAZ in its inventory than those outstanding, was no longer listing those shares on public exchanges, and so short sellers were unable to look to Credit Suisse to cover their shorts. Accordingly, a premium began to develop whereby the price of DGAZF started to rise significantly above its Indicative Value—in other words, a short squeeze. *Id.* ¶¶ 25, 90-95; *see also id.* ¶ 77.

The premium began to build in August 2020. On August 4, 2020—twenty-four days after the delisting and forty-three days after the Press Release—DGAZF began trading at approximately

$600 per note.  *Id.* ¶ 92; *see id.* ¶ 26.  By August 10, 2020, the price of DGAZF had increased to roughly $3,500 per note.  *Id.* ¶ 92.  The Financial Industry Regulatory Authority ("FINRA") finally halted trading of DGAZF on August 12, 2020, when its price peaked at $25,000 per note.  *Id.* ¶¶ 27-29, 95, 98.  All the while, the Indicative Value of the DGAZF ETNs remained around $110 to $130.  *Id.* ¶ 90.  That same day, Defendant exercised its option to accelerate all outstanding DGAZF ETNs, and to pay investors a cash payment based on the rolling average Indicative Value of DGAZF between August 14, 2020 and August 20, 2020.  *Id.* ¶¶ 30, 99.

**E.    Plaintiff's Claims**

Plaintiff initiated five short positions in DGAZ on May 27, 2020, and another five positions on May 29, 2020.  Compl., Exh. 1 ¶ 3(a), (b); *see also* Compl. ¶ 108.  Plaintiff claims to have "maintained her short positions following the Press Release in reasonable reliance on the belief that DGAZ would continue to function as an ETN that tracked the underlying Index value."  *Id.* ¶ 112.  However, after the excessive premium buildup, Plaintiff was forced to cover her shorts at a significant loss.  *Id.* ¶ 113, Exh. 1 ¶ 3.

Plaintiff alleges securities fraud in violation of the Exchange Act in that "[t]he Press Release was materially false and misleading insofar as it misrepresented and failed to disclose . . . the fact that market conditions were such that a short squeeze was imminent, and that the price of DGAZ(F) would become completed dislocated from the underlying Index value."  *Id.* ¶ 138.  In its opposition brief, Plaintiff contends that the Complaint also includes a claim for market manipulation based on Defendant's "reckless decision to delist and suspend DGAZ" which, "combined with Credit Suisse's ownership of over 100% of the outstanding interests[,] . . . created an artificial market where Credit Suisse had effective total control over the 'market' but refused to operate it efficiently, if at all" resulting in "a complete 'distortion,' or dislocation, between the

market pricing and the actual underlying economic value . . . of DGAZ." Dkt. 26 ("Opposition") at 23 (citing Compl. ¶¶ 2, 21, 34, 80, 93, 141, 145).[3]

### F.   Procedural History

Plaintiff filed her Complaint on January 6, 2022. Dkt. 1. On April 22, 2022, Judge Barbara C. Moses, to whom the case had been referred for general pretrial supervision, Dkt. 6, granted Plaintiff's unopposed motion to be appointed as lead plaintiff pursuant to the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 ("PSLRA"), *see* Dkt. 17. On May 11, 2022, after Plaintiff indicated that she did not intend to amend THE Complaint, Judge Moses directed Defendant to answer or otherwise respond to the Complaint by July 11, 2022. Dkt. 19. Defendant moved to dismiss on July 11, 2022. Dkt. 20-22. Plaintiff filed her opposition brief on September 30, 2022, and Defendant replied on November 21, 2022, *see* Dkts. 29 ("Reply"), 30.

## II.  Legal Standard

To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative

---

[3] The Complaint contains only one cause of action and does not appear to clearly delineate between Plaintiff's misrepresentation claim and her market manipulation claim. *See* Compl. ¶¶ 133-47. These are separate and distinct claims notwithstanding that they arise under the same statute. Each, therefore, should have been set forth in a separate count. *Cf. Sam S. Goldstein Indus., Inc. v. Botany Indus., Inc.*, 301 F. Supp. 728, 732 (S.D.N.Y. 1969) (Sherman and Clayton Act claims should have been alleged as separate counts "notwithstanding plaintiff's contentions that the same acts give rise to violations of both sections"). However, the Court will assume for the purpose of deciding Defendant's Motion that "each charged violation had been set forth in a properly structured complaint." *Id.*

level." *Twombly*, 550 U.S. at 555.   Although the Court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor," *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015), it need not "accept as true legal conclusions couched as factual allegations," *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475-76 (2d Cir. 2009).

Where, as here, a plaintiff's claim sounds in fraud, a complaint must meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b).   *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).   "Rule 9(b) requires that 'a party must state with particularity the circumstances constituting fraud or mistake,' although '[m]alice, intent, knowledge and other conditions of a person's mind may be alleged generally.'"   *Valentini v. Grp. Health Inc.*, No. 20 Civ. 9526 (JPC), 2021 WL 6113991, at *3 (S.D.N.Y. Dec. 27, 2021) (alteration in original) (quoting Fed. R. Civ. P. 9(b)), *aff'd*, No. 22-157, 2023 WL 2027273 (2d Cir. Feb. 16, 2023).   In other words, Rule 9(b) requires pleading the circumstances of the fraud and the defendant's mental state.   *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 171 (2d Cir. 2015). To satisfy this heightened burden, a complaint must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent."   *Id.* (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004)).   Allegations that are conclusory or unsupported by factual assertions are insufficient.   *See ATSI Commc'ns*, 493 F.3d at 99; *see also Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986).

Securities fraud claims must also satisfy heightened pleading requirements under the PSLRA.   *Diesenhouse v. Social Learning & Payments, Inc.*, No. 20 Civ. 7436 (LJL), 2022 WL 3100562, at *5 (S.D.N.Y. Aug. 3, 2022).   Per the PSLRA, "the complaint shall specify each

statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); *see Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462 (2d Cir. 2019). In pleading scienter, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); *see Diesenhouse*, 2022 WL 3100562, at *5. "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues Rights, Ltd.*, 551 U.S. 308, 323 (2007). For an inference of scienter to be strong, "a reasonable person must deem it cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *ATSI Commc'ns*, 493 F.3d at 99 (brackets and emphasis omitted) (quoting *Tellabs*, 551 U.S. at 324).

Although pleading standards are heightened for securities fraud claims, the Second Circuit has cautioned courts "not to mistake heightened pleading standards for impossible ones.'" *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 150 (2d Cir. 2021) (quoting *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 161 (2d Cir. 2021)). The PSLRA does not demand "that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based." *Novak v. Kasaks*, 216 F.3d 300, 313 (2d Cir. 2000). Nor does Rule 9(b) "require the pleading of detailed evidentiary matter in securities litigation." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).

### III. Discussion

"Section 10(b), in proscribing the use of a 'manipulative or deceptive device or contrivance,' . . . prohibits not only material misstatements but also manipulative acts." *ATSI*

*Commc'ns*, 493 F.3d at 99 (quoting 15 U.S.C. § 78j(b)).   Rule 10b-5, in turn, prohibits the following conduct "in connection with the purchase or sale of any security":

> (a)  To employ any device, scheme, or artifice to defraud,
> (b)  To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c)  To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person[.]

17 C.F.R. § 240.10b-5.  Thus, while subsection (b) proscribes material misstatements or omissions, subsections (a) and (c) create what is known as "scheme liability" for manipulative acts or deceptive conduct.  *Bai v. Tegs Mgmt., LLC*, No. 20 Civ. 4942 (DLC), 2022 WL 602711, at *5-6 (S.D.N.Y. Mar. 1, 2022); *see also Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 98, 105 (2d Cir. 2021).

To state a claim for securities fraud based on a material misrepresentation or omission, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 82 (2d Cir. 2021) (quoting *Stoneridge Inv. Partners, LLC v. Sci-Atlanta, Inc.*, 522 U.S. 148, 157 (2008)).   To state a claim for scheme liability or market manipulation, a plaintiff must show: "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance," and also that "the deceptive or fraudulent scheme or activity . . . occurred in connection with the purchase or sale of a security." *Plumber & Steamfittters*, 11 F.4th at 105.[4]  Defendant

---

[4] As Plaintiff notes in its opposition brief, Opposition at 10, the Second Circuit has, at times, adhered to a slightly different formulation of the elements of this claim. *See, e.g.*, *Set Cap.*, 996 F.3d at 76 ("To state a claim for market manipulation under Section 10(b), a plaintiff must plausibly allege '(1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an

contends, *inter alia*, that Plaintiff fails to allege a material misstatement or omission, Motion at 11-14, manipulative acts, *id.* at 14-15; Reply at 11-13, or a strong inference of scienter, Motion at 17-23.  The Court agrees.[5]

## A.    Misstatements or Omissions of Material Fact

"Section 10(b) claims require that [p]laintiffs plausibly allege a material misrepresentation or omission by the defendant."  *In re Dynagas LNG Partners LP Sec. Litig.*, 504 F. Supp. 3d 289, 308 (S.D.N.Y. 2020).  "The test for whether a statement [or omission] is materially misleading under Section 10(b) is not whether the statement was misleading in and of itself, but whether the defendants' representations, taken together and in context, would have mislead a reasonable investor."  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) (internal quotation marks and emphasis omitted).  "This test is objective and looks to the understanding of the 'ordinary investor.'"  *Chapman v. Muller Water Prods., Inc.*, 466 F. Supp. 3d 382, 396 (S.D.N.Y. 2021) (quoting *Omnicare, Inc. v. Laborers Dist. Council. Const. Indus. Pension Fund*, 575 U.S. 175, 187 (2015)).

"Whether a misstatement [or omission] is material 'depends on whether there is a substantial likelihood that a reasonable [investor] would consider it important in deciding how to act.'"  *Plumber & Steamfitters*, 11 F.4th at 100 (quoting *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009)).  Materiality "is satisfied when

_____

efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange.'" (quoting *ATSI Commc'ns*, 493 F.3d at 101)).  Regardless of which formulation is ultimately correct, or whether "scheme liability" is technically distinct from "market manipulation," both require Plaintiff to plausibly allege "manipulative acts" and "scienter," which, as discussed *infra*, she has failed to do.

[5] Given the dismissal on these grounds, the Court declines to address Defendant's additional arguments—that it lacked a duty to disclose, Motion at 16-17, and that Plaintiff fails to adequately plead loss causation, *id.* at 23-25.

there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (internal quotation marks omitted). Thus, the Court considers "not only the disclosures the company makes, but also 'information already in the public domain and facts known or reasonably available to the shareholders.'" *In re Dynagas*, 504 F. Supp. 3d at 308-09 (quoting *Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 668 (2d Cir. 2009)). "Because materiality involves a 'fact-specific inquiry,' . . . it can be decided on a motion to dismiss only if 'reasonable minds cannot differ on the question of materiality.'" *Plumber & Steamfitters*, 11 F.4th at 101 (quoting first *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988) then *TSC Indus. Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)). "A securities fraud claim for misrepresentations or omissions does not lie when a company disclosed the very risks about which a plaintiff claims to have been misled." *City of Coral Springs Police Officers' Ret. Plan. v. Farfetch Ltd.*, 565 F. Supp. 3d 478, 493 (S.D.N.Y. 2021) (internal quotation marks and ellipsis omitted).

Plaintiff alleges that the Press Release was "materially false and misleading insofar as it misrepresented and failed to disclose . . . the fact that market conditions were such that a short squeeze was imminent, and that the price of [DGAZF] would become completely dislocated from the underlying Index value." Compl. ¶ 138. This argument fails, however, given Defendant's repeated, extensive, and explicit prior disclosures of the investment risk, as well as publicly available information.

To begin, the Offering Documents contain extensive risk disclosures, many of which are bolded, underlined, and/or italicized, warning of the exact harm that occurred. While they do not use the term "short squeeze," the Offering Documents warn, for example, that that the price of

DGAZ was subject to independent supply and demand forces, which could potentially cause a premium over Indicative Value, *see, e.g.*, Offering Documents at 11, 20, 65, 76, and, in particular, that Credit Suisse's decision to delist and/or suspend issuance of DGAZ could impact the supply of and demand for DGAZ and cause the outstanding ETNs to trade at a premium, *see, e.g.*, *id.* at 3 (Credit Suisse is "under no obligation to issue or sell additional ETNs at any time . . . . **Any limitation or suspension on the issuance of the ETNs may materially and adversely affect the price and liquidity of the ETNs in the secondary market.  Alternatively, the decrease in supply may cause an imbalance in the market supply and demand, which may cause the ETNs to trade at a premium over the Indicative Value of the ETNs.**" (emphasis in original)), 45 ("**Any limitation or suspension on the issuance or sale of the ETNs may impact the trading price of the ETNs, including by creating a premium over the Indicative Value of the ETNs that may be reduced or eliminated at any time.**" (emphasis in original)); *see also id.* at 11, 42-45, 76.  Thus, when Plaintiff initiated her short positions in DGAZ, she was well-warned.  *See also In re TVIX Sec. Litig.*, 25 F. Supp. 3d 444, 457-58 (S.D.N.Y. 2014) (concluding that offering documents for a similar product as the one at issue in this case contained sufficient disclosures of Credit Suisse's discretion to delist or stop issuing ETNs and the risks associated with doing so), *aff'd sub nom.*, *Elite Aviation LLC v. Credit Suisse AG*, 588 F. App'x 37 (2d Cir. 2014).

Pointing to *In re Direxion Shares ETF Trust*, 279 F.R.D. 221 (S.D.N.Y. 2012), Plaintiff argues that these risk disclosures were insufficient in light of "contra-indicators" that "the price of a DGAZ note was inextricably connected to the Index."  *See* Opposition at 13-14; *see also id.* at 4-5 (collecting quotes from the Offering Documents suggesting that DGAZ "will track the daily performance of the underlying index"); Compl. ¶ 52.  In *Direxion*, Judge Katherine B. Forrest rejected the defendants' argument that the prospectus for certain exchange-traded funds ("ETFs")

clearly indicated that the ETFs were "daily" in nature, when the prospectus "also contained contra-indicators, signifying that holding [them] for longer than a day was appropriate." 279 F.R.D. at 232. Specifically, the prospectus suggested that investors could earn both "daily returns" and "return[s] . . . for a period longer than a single day." *Id.* In other words, the prospectus in *Direxion* suggested that it was both appropriate and inappropriate to hold certain ETFs for longer than a day. In contrast, the Offering Documents here do not suggest that DGAZ both tracks and does not track the Indicative Value of the Index. While the *purpose* of DGAZ is to "track the daily performance of [the Index] as reflected by [its] Indicative Value," Offering Documents at 3, its *ability to do so* is subject to supply and demand forces, *e.g.*, *id.* at 43-44, 76. Thus, the risk disclosures in the Offering Documents merely qualify rather than contradict statements suggesting that the price of DGAZ is tied to its Indicative Value. And the Offering Documents repeatedly made clear, sometimes with bold for emphasis, that the trading price for the ETNs may at any time vary significantly from the Indicative Value. *E.g.*, *id.* at 3, 4, 5, 6, 11, 15, 20, 43, 46, 65, 76.

Next, the June 22, 2020 Press Release, which announced Defendant's decision to delist and suspend further issuance of DGAZ, itself incorporated by reference the risk disclosures in the Offering Documents. *See* Press Release at 2 ("*As disclosed in the Risk Factors section of the Pricing Supplement*, the market value of the ETNs may be influenced by, among other things, the levels of actual and expected supply and demand for the ETNs in the secondary market." (emphasis added)). The Press Release further expressly warned that "[i]t is possible that this announcement and the delisting and suspension of further issuances of the ETNs . . . may influence the market value of the ETNs" because, among other things, "suspending further issuances of the ETNs may further adversely affect the liquidity for any secondary market that may develop following a delisting" and that "paying a premium purchase price over the indicative value of the ETNs could

lead to significant losses." *Id.* Thus, the Press Release clearly contemplated and warned that delisting DGAZ could affect supply and demand in a manner that might lead to the development of a premium purchase price and thus significant losses to short sellers. And to reiterate and reemphasize for investors the risks involved, the Press Release explicitly referred them to the risk disclosures in the Offering Documents.

The essential question in this case is whether, given the market reality involving DGAZ and in particular the significant short interest and Defendant's holdings, more detailed warnings were required. Plaintiff argues they were. She asserts that Defendant's "general conditional warnings of events that may occur in the future are insufficient" because "a ***specific risk*** had materialized, in the form [of] an imminent short squeeze." Opposition at 11-12 (emphasis in original); *see also id.* at 14-15 ("The Press Release's partial and incomplete disclosure was insufficient in light of Credit Suisse's possession of information showing that the former 'market' for DGAZ was now a rigged game in favor of Credit Suisse . . . ."). But "the securities laws do not require issuers to predict the precise manner in which disclosed risks will manifest themselves." *Rubinstein v. Credit Suisse Grp. AG*, 457 F. Supp. 3d 289, 298 (S.D.N.Y. 2020) (concluding that similar offering documents to those at issue in this case sufficiently "warned that Defendants' hedging activity might 'adversely affect the level of the applicable underlying Index and, as a consequence, the market value of the ETNs and the amount payable at maturity, upon redemption or upon acceleration" and so the defendants' were not liable for securities fraud when that risk eventually materialized); *see In re TVIX*, 25 F. Supp. 3d at 445 ("Once Credit Suisse warned investors that the TVIX ETNs' price could be affected by changes in supply and demand, and further explained in the press release that the suspension of new issuances could result in a premium of market price over Indicative Value, it was not obligated to make a prediction as to the

probability that this would occur."); *see also In re ProShares Tr. Sec. Litig.*, 889 F. Supp. 2d 644, 656 (S.D.N.Y. 2012) ("It is not a material omission to fail to predict future market performance."), *aff'd*, 728 F.3d 96 (2d Cir. 2013).  This is particularly true here because, as Defendant points out in its reply brief, "[o]nce Credit Suisse stopped issuing new ETNs, investors had exclusive control over the supply, since investors could: (1) hold onto their ETNs, (2) sell them into the market, thereby increasing the supply of ETNs available to others, or (3) [for investors with 25,000 or more notes of DGAZF] redeem their ETNs with Credit Suisse at any time, thereby reducing the number of outstanding ETNs."  Reply at 3 n.3.  Moreover, Plaintiff does not allege that Defendant did anything to impact supply and demand between delisting DGAZ and its ultimate decision to accelerate it.  In fact, Plaintiff alleges that following delisting, "DGAZF took on a life of its own" and that Defendant "wait[ed] for the short squeeze to materialize."  Compl. ¶¶ 33, 36.  Thus, because Defendant explicitly warned that supply and demand forces could cause the price of DGAZ to rise above its indicative value—which is exactly what occurred, *see Rubinstein*, 457 F. Supp. 3d at 298—and because Plaintiff points to no authority or factual allegations to suggest that Defendant did something to impact the supply or increase demand once DGAZ was already delisted, the warnings in the Offering Documents and the Press Release were directly on point, and sufficient to put a reasonable investor on notice of the risk of a short squeeze.

Nor does Plaintiff contend that there have been any prior instances where suspending issuance of and delisting an ETN led to a price premium or a short squeeze.  *Cf. Set Cap.*, 996 F.3d at 85-86 (a warning that "Credit Suisse's hedging activity 'could' or 'may' impact prices of VIX Notes but . . . that Credit Suisse had 'no reason to believe' that it would" was materially misleading given that the "three prior volatility spikes" should have caused Credit Suisse to know "with virtual certainty that, upon the next volatility spike, their hedging activity would significantly depress the

value" of certain ETNs).  To the contrary, as alleged by Plaintiff, "in those [past] instances when an ETN is delisted and further issuances suspended, the price will trade at a discount to the underlying indicative value, as investors' only other option is to carry outstanding notes until maturity while their value decays toward zero."  Compl. ¶ 12.  And in fact, according to the Complaint, this is precisely what occurred when Defendant delisted a different ETN in 2016.  *Id.* ¶ 66.  Thus, even if Defendant perceived a risk of an imminent short squeeze, Defendant needed to balance that with its previous experience of the price of ETNs decreasing following delisting. The Press Release struck this balance by warning investors that "Credit Suisse AG cannot predict with certainty what impact, if any, these events will have on the public trading price of the ETNs," and specifically flagging the risk of a premium purchase price that could lead to significant losses and pointing investors to the risk disclosures in the Offering Documents.  Press Release at 2.

Finally, Plaintiff had all the necessary information at her disposal to reach a conclusion on her own as to the likelihood of a short squeeze.  First, even if "Credit Suisse had firsthand actual knowledge of the outstanding short interest for DGAZ," Compl. ¶ 78, the Complaint lacks any allegation that this information was known only to Defendant.[6]  Defendant also points to certain press reports noting DGAZ's substantial short interest and the potential for a short squeeze.  *See* Motion at 8 (citing *10 ETFs That Could Be Primed For A Short Squeeze*, Yahoo! (Sept. 9, 2019); Why 3x Leveraged Natural Gas ETFs Are So Dangerous – Besides the Obvious, Seeking Alpha (Nov. 11, 2019)).  Plaintiff challenges the weight that should be given to these sources, arguing that "[a] crowed-sourced blog post or a blurb on a 'Yahoo!' page are not the Wall Street Journal,

---

[6]  In fact, the Complaint suggests the opposite by noting that SEC filings revealed Defendant's large inventory of DGAZ in comparison to shares outstanding, which is indicative of a product with a substantial short interest.  Compl. ¶ 17 n.2.  As discussed *infra*, this information was publicly available.

and suggesting that one or both of these sources to charge Plaintiff with knowledge that a short squeeze would occur some seven to ten months after these articles were published is not 'reasonable.'"  Opposition at 16 (footnote omitted).  But there is no requirement in this Circuit that information be published in the *Wall Street Journal* to be included in the "total mix" of available information to an investor.  Moreover, while perhaps these articles standing alone would not be sufficient to put a reasonable investor on notice that a short squeeze was likely to occur, they demonstrate that DGAZ's substantial short interest was public information as of 2019, and Plaintiff does not allege that it changed in a meaningful way leading up to the delisting.  *See Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 426 (2d Cir. 2008) ("[I]t is proper to take judicial notice of the *fact* that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the[ir] truth . . . .").

Similarly, while Plaintiff alleges that Defendant "had exclusive control over the supply of DGAZ shares immediately prior to the effective date of the delisting"—noting that Defendant held "431,350 units of DGAZ, compared to only 305,418 outstanding," which she claims indicated that a short squeeze was imminent—Plaintiff also alleges that this information was gleaned from "data reported to the SEC" and thus publicly available.  Compl. ¶¶ 17-21.  Plaintiff argues that the information contained in these SEC reports was "stale," and that "only Credit Suisse had the data showing real time market conditions as of the date of the Press Release."  Opposition at 16.  But nowhere in the Complaint does Plaintiff allege that Defendant's DGAZ holdings were significantly different from those reported in the SEC filings, or that Defendant's SEC filings leading up to the delisting reported different numbers.  In fact, the Complaint relies on this very same SEC filings information to support its allegation that Credit Suisse had exclusive control over DGAZ shares immediately following the delisting.

22

Ultimately, Plaintiff chose to embark on a highly risky investment strategy. In the words of the Second Circuit, "there is no limit to the short seller's potential loss: if the price of the stock rises, so too does the short seller's loss, and since there is no cap to a stock's price, there is no limitation on the short seller's risk." *Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 203 n.3 (2d Cir. 2014). She made the decision to short DGAZ with all the information at her disposal to allow her to understand the risk of a short squeeze and a premium build. Defendant made clear repeatedly in the Offering Documents the risk that a premium price could develop. When Defendant ultimately announced its decision to delist DZAG, the Press Release reiterated that risk. And there are no factual allegations to plausibly suggest that DGAZ's substantial short interest and Defendant's large inventory of DGAZ notes in comparison to the notes outstanding were information known only to Defendant. Accordingly, the Court concludes that, based on the allegations in the Complaint, the Offering Documents, and the Press Release, any further explicit warning regarding the risk of a short squeeze would not have been material to a reasonable investor in light of the total mix of information available.

## B.   Manipulative Acts

Turning to Plaintiff's purported "market manipulation" claim, the Supreme Court has described "manipulative" as "virtually a term of art when used in connection with securities markets." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976); *see also ATSI Commc'ns*, 493 F.3d at 99-100. "It 'refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity, and 'connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities.'" *Set Cap.*, 996 F.3d at 76 (quoting first *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977) then *Ernst & Ernst*, 425 U.S. at 199). "[A] manipulation

complaint must plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants." *ATSI Commc'ns*, 493 F.3d at 102. "General allegations not tied to the defendants or resting upon speculation are insufficient." *Id.* Rather, "a plaintiff must specify what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue." *Plumber & Steamfitters*, 11 F.4th at 105 (internal quotation marks omitted); *see also ATSI Commc'ns*, 493 F.3d at 102 (noting that "[t]his standard meets the goals of Rule 9(b) while also considering which specific facts a plaintiff alleging manipulation can realistically plead at this stage of the litigation").

As in *Plumber & Steamfitters*, Plaintiff "[a]t no point . . . articulate[s] with precision the contours of an alleged scheme to" manipulate the market for DGAZ, "or which specific acts were conducted in furtherance of it." *Plumber & Steamfitters*, 11 F.4th at 105. The Complaint does not even allege that Defendant in fact manipulated the market for DGAZ, let alone facts to plausibly support an inference of such manipulation. Instead, what Plaintiff alleges is that Defendant's decision to delist and suspend issuance of DGAZ coupled with its sizeable inventory of DGAZ and the substantial short interest created a scenario "where *institutions* holding long positions *could* manipulate trade prices to force individuals to cover their short positions." Compl. ¶ 77 (emphasis added). Thus, while Credit Suisse's decision may have created a potential for market manipulation by others, there are no allegations that Credit Suisse itself engaged in the manipulation, such as by selling its inventory of DGAZ at the inflated premium to desperate investors like Plaintiff looking to cover their shorts. *See Plumber & Steamfitters*, 11 F.4th at 105 ("Absent some sort of enumeration of which specific acts constituted an alleged scheme in connection with the purchase or sale of securities, the Funds' claim does not comply with the applicable heightened pleading standard and cannot go forward.").

Plaintiff argues that Defendant's decision to suspend issuance of and delist rather than accelerate DGAZ was sufficient to constitute market manipulation on its own, considering the substantial short interest in DGAZ and Defendant's large inventory compared to the notes outstanding.  Opposition at 23-24.  But as noted above, Defendant warned its investors that it had unfettered discretion to discontinue DGAZ and that doing so could adversely affect supply and demand and trigger a premium over the Indicative Value.  *See* Offering Documents at 3 (warning that Credit Suisse is "under no obligation to issue or sell additional ETNs at any time" and that "**limitation or suspension on the issuance of the ETNs may materially and adversely affect the price and liquidity of the ETNs in the secondary market.  Alternatively, the decrease in supply may cause an imbalance in the market supply and demand, which may cause the ETNs to trade at a premium over the Indicative Value of the ETNs.**" (emphasis in original)).  Thus, Defendant's act of delisting rather than accelerating DGAZ was neither manipulative nor deceptive.[7]   And in any event, even if this somehow could constitute market manipulation, the Complaint contains nowhere near enough details to properly allege the who, what, when, where, and why of the fraudulent scheme.  Thus, Plaintiff has failed to plausibly allege manipulative acts as required to state a claim for market manipulation.

## C.   Scienter

Even if the Complaint contained sufficient allegations to plausibly allege a material omission or manipulative acts, Plaintiff still fails to plead a strong inference of scienter.  To plead scienter, Plaintiff must allege facts showing "either: 1) a 'motive and opportunity to commit the

---

[7] While true that "open-market transactions that are not, in and of themselves, manipulative or illegal, may constitute manipulative activity within the meaning of Section 10(b) when coupled with manipulative intent," *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 82 (S.D.N.Y. 2015); *see also Set Cap.*, 996 F.3d at 77-78, as discussed *infra*, Plaintiff fails to plead any inference (let alone a strong one) of scienter.

fraud'; or 2) strong circumstantial evidence of conscious misbehavior or recklessness." *Emps.'*
*Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (quoting *ATSI*
*Commc'ns*, 493 F.3d at 99). As the Second Circuit has explained:

> Circumstantial evidence can support an inference of scienter in a variety of ways,
> including where defendants (1) benefitted in a concrete and personal way from the
> purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had
> access to information suggesting that their public statements were not accurate; or
> (4) failed to check information they had a duty to monitor.

> A complaint will survive if a reasonable person would deem the inference of
> scienter cogent and at least as compelling as any opposing inference one could draw
> from the facts alleged.

*Id.* (internal quotation marks omitted).

"When the defendant is a corporate entity, this means that the pleaded facts must create a
strong inference that someone whose intent could be imputed to the corporation acted with the
requisite scienter." *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap., Inc.*, 531 F.3d
190, 195 (2d Cir. 2008). "In most cases, the most straightforward way to raise such an inference
of a corporate defendant will be to plead it for an individual defendant." *Id.* "But it is possible to
raise the required inference with regard to a corporate defendant without doing so with regard to a
specific individual defendant." *Id.*

### 1.      Motive and Opportunity

"Sufficient motive allegations 'entail concrete benefits that could be realized by one or
more of the false statements and wrongful nondisclosures alleged." *Kalnit v. Eichler*, 264 F.3d
131, 139 (2d Cir. 2001) (internal quotation marks omitted). Plaintiff points to Defendant's
potential to earn "investor fees" as supporting a motive and opportunity theory of scienter.
Opposition at 21. She argues that "[b]y delisting DGAZ instead of accelerating it, Credit
Suisse . . . positioned itself to benefit financially, regardless of whether it sold (or later intended to
sell) into the ensuring short squeeze" because "[t]he prospect of continuing to realize daily investor

fees (regardless of size) as opposed to having to outlay cash to wind down its DGAZ product, is a plausible explanation for Credit Suisse's actions."  Opposition at 21.

There are several significant problems with this theory.  First, as Defendant notes in its opening brief, accepting as true the Complaint's allegation that this "decision to delist . . . represented approximately $1.5 million annually [in investor fees] based on the shares outstanding and Indicative Value as of the Press Release," Compl. ¶ 36; *accord id.* ¶ 82, "assuming a constant rate of return, these fees would have totaled $135,600 over the course of the 33 days between the delisting and acceleration."  Motion at 19.  It would be a stretch to impute a motive to defraud investors of roughly $135,000 to a company the size of Credit Suisse, especially when the Complaint lacks any detail whatsoever as to who at Credit Suisse was involved.  *Cf. Plumber & Steamfitters*, 11 F.4th at 105 ("Money-laundering at a single branch in Estonia cannot alone establish that Dankse bank itself carried out a deceptive scheme to defraud investors."); *Duncan v. Pencer*, No. 94 Civ. 321 (LAP), 1996 WL 19043, at *9-10 (S.D.N.Y. Jan. 18, 1996) (holding that "receipt of professional fees is not sufficient motive" for pleading scienter, and collecting cases).  And more importantly, these investor fees pale in comparison to the millions of dollars Defendant could have made by selling into the short squeeze, making any inference of fraudulent intent even less plausible.  *See* Compl. ¶¶ 94-97.  Under Plaintiff's theory, Defendant chose to make a mere $1.5 million annually—and $135,600 over thirty-three days—rather than by selling any part of its over 430,000 units of DGAZ at rates of over 200-times their Indicative Value.  *Id.* ¶ 95; *cf. Set Cap.*, 996 F.3d at 81-82 (holding that the complaint plausibly alleged evidence of motive and opportunity given "the structure of the XIV Notes, which would allow Credit Suisse to profit if the value of the notes collapsed," the fact that Credit Suisse's CEO "was under significant pressure to shift Credit Suisse's investment arm away from volatile assets like XIV

Notes," and because the CEO received a substantial "bonus for successfully shifting Credit Suisse away from volatile assets such as XIV Notes").

Further, Defendant earns investor fees on every note of DGAZ outstanding. Previous experience showed that when Defendant delisted an ETN, retail investors sold to institutional investors who then redeemed large blocks with Defendant for the market value. Accordingly, Defendant's experience would suggest that the decision to delist would decrease the potential to earn investor fees, whereas if Defendant continued issuing and listing DGAZ, it could earn investor fees until the notes mature—in 2032. Thus, the decision to delist DGAZ along with eight other ETNs does not suggest a motive to commit fraud, since Defendant could have earned more investor fees by continuing to produce and sell DGAZ on the NYSE Arca Exchange. And on top of this, even if Defendant did delist DGAZ solely to earn investor fees, there would be no reason for it to choose to accelerate DGAZF a mere thirty-three days later.

### 2.   Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness

"Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious misbehavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Kalnit*, 264 F.3d at 142 (internal quotation marks omitted). At a minimum, a plaintiff must allege "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000) (internal quotation marks omitted).

Plaintiff suggests that recklessness is evident given Defendant's "exclusive, real-time knowledge of the three data points—total shares outstanding; short interest; and Credit Suisse's holdings—establishing the inevitable short squeeze and price dislocation." Opposition at 19. The

Court has already rejected Plaintiff's arguments that this information was "exclusive" to Defendant and that this information ensured that a short squeeze and price premium were inevitable.  Thus, it is not surprising that Plaintiff has not alleged *which of* Defendant's employees had each piece of information necessary for Defendant to predict accurately how supply and demand would dictate the price of DGAZF to the detriment of investors—*i.e.*, an imminent short squeeze and spiked premium price distant from the Indicative Value.  *See Denny v. Canaan Inc.*, No. 21 Civ. 3299 (JPC), 2023 WL 2647855, at *13 (S.D.N.Y. Mar. 27, 2023) (explaining that a plaintiff must allege "*how* [a defendant] would have this information, regardless of how important it may have been").  "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."  *Novak*, 216 F.3d at 309; *see also Dynex Cap.*, 531 F.3d at 196.  This is particularly true here given the lack of allegations that Defendant participated in the DGAZ market apart from maintaining a large inventory of notes.

Nor has Plaintiff pleaded that Defendant's decision to delist DGAZ rather than accelerate it was reckless.  Defendant chose to delist not just DGAZ but eight other ETNs.  *See* Press Release at 1.  Defendant's past experience also suggested that the price of ETNs decreases following delisting.  Compl. ¶ 12.  Plaintiff of course argues that "what made DGAZ unique, or historic, among Credit Suisse's other ETNs was the size of the outstanding short interest, and the fact that Credit Suisse[] had effective total control over the shares available to cover those short positions."  Opposition at 19.  But as discussed above, Defendant could not predict with absolute certainty how investors would act following the delisting, and it is notable that the premium did not begin until twenty-four days after the delisting.  A reasonable inference is that this was likely because Defendant took care to safeguard the interests of DGAZ investors in its decision to delist rather than to accelerate.  First, while it announced the decision on June 22, 2020, it gave investors until

July 10, 2020 to continue buying DGAZ on the NYSE Arca Exchange, thereby providing short sellers like Plaintiff, the opportunity to cover their shorts before supply was decreased.  Second, as discussed above, it provided investors with clear warnings that delisting could affect supply and demand, both in the Press Release itself and by referencing the risk disclosures in the Offering Documents.

* * *

"[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences."  *Tellabs*, 551 U.S. at 323.  Here, the Court cannot conclude that an inference of scienter is "cogent and at least as compelling as [the] opposing inference of nonfraudulent intent."  *ECA*, 553 F.3d at 198 (quoting *Tellabs*, 51 U.S. at 314).  Once Credit Suisse decided it no longer wished to be in the DGAZ business, its decision to delist instead of accelerate was nothing more than a prudent business decision, and one well within its rights.  And even if delisting presented a heightened risk of leading to a premium price and a short squeeze, Defendant warned short sellers like Plaintiff of this possibility when they initiated those short positions.  Defendant then referred them to those warnings when it announced its decision to delist.  And finally, after DGAZ's price became so inflated that FINRA halted trading, Defendant did in fact accelerate the notes, thereby cutting itself off from investor fees.  Accordingly, the Court finds that Plaintiff has failed to plead a strong inference of scienter.

### D.     Leave to Amend

Under Rule 15(a) of the Federal Rules of Civil Procedure, a court should freely give leave to amend "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Plaintiff has asked the Court for leave to amend the Complaint should the Court rule in Defendant's favor.  Opposition at 24-25.  Plaintiff has not yet amended the Complaint, and while she purposefully declined to do so in

response to Judge Moses appointing her lead plaintiff, *see* Dkt. 18, Plaintiff did not yet have the benefit of knowing what deficiencies Defendant would raise to challenge the Complaint.  The Court therefore grants leave to amend.  The Court emphasizes that Plaintiff should only file an amended complaint if she can remedy the pleading deficiencies identified herein.

## IV.  Conclusion

For the stated reasons, Defendant's motion to dismiss is granted.  The Court grants Plaintiff leave to amend her Complaint.  In the event Plaintiff decides to file an amended complaint, she must do so within thirty days of this Opinion and Order.  If Plaintiff fails to file an amended complaint within thirty days, and does not show good cause to excuse the failure to do so, the Court will dismiss this action with prejudice.

The Clerk of Court is respectfully directed to close Docket Numbers 20 and 23.

SO ORDERED.

Dated: March 31, 2023
     New York, New York

                                           JOHN P. CRONAN
                             United States District Judge